NOT YET SCHEDULED FOR ORAL ARGUMENT

**No. 25-1264 (Consolidated with 25-1266)**

# In the United States Court of Appeals for the District of Columbia Circuit

———————

CLEAN WISCONSIN, ET AL.,
PETITIONERS

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

———————

*ON PETITION FOR REVIEW OF FINAL ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION*

———————

## OPENING BRIEF OF PETITIONERS

———————

NICHOLAS M. GLADD
MATT CHRISTIANSEN
JOHN B. KENNEY
BRYAN SHPALL
RACHEL NEUBURGER
*Wilson Sonsini Goodrich & Rosati, P.C.*
*1700 K. St. N.W.*
*Washington, DC 20006*
*(781) 719-8255*
*ngladd@wsgr.com*

*Counsel for Advanced Energy
United, American Clean Power
Association, Clean Grid Alliance, and
Solar Energy Industries Association*

ADA STATLER
SAMEER DOSHI
AARON STEMPLEWICZ
*Earthjustice*
*180 Steuart St. #194330*
*San Francisco, CA 94105*
*(415) 217-2091*
*astatler@earthjustice.org*

*Counsel for Clean Wisconsin
and Natural Resources
Defense Council*

MELISSA ALFANO
*Solar Energy Industries Association*
*1425 K St. NW, Suite 100*
*Washington, DC 20005*
*(703) 589-5446*
*malfano@seia.org*

*Counsel for Solar Energy*
*Industries Association*

CAROLINE REISER
*Natural Resources Defense Council*
*1152 15th St. NW, Suite 300*
*Washington, DC 20005*
*(202) 717-8341*
*creiser@nrdc.org*

*Counsel for Natural Resources*
*Defense Council*

GREGORY E. WANNIER
*Sierra Club*
*2101 Webster St., Suite 1300*
*Oakland, CA 94612*
*(415) 977-5646*
*greg.wannier@sierraclub.org*

JONAH BASKIN
*Sierra Club*
*50 F St. NW, 8th Floor*
*Washington, DC 20001*
*(202) 556-3917*
*jonah.baskin@sierraclub.org*

*Counsel for Sierra Club*

APRIL 17, 2026

**CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES**

Pursuant to D.C. Cir. Rule 28(a)(1), Petitioners certify as follows:

I.     **Parties, Intervenors, and *Amici***

Petitioners:

25-1264: Clean Wisconsin, Natural Resources Defense Council,

Sierra Club

25-1266: Advanced Energy United, American Clean Power

Association, Clean Grid Alliance, Solar Energy Industries

Association

Respondent:

25-1264: Federal Energy Regulatory Commission

25-1266: Federal Energy Regulatory Commission

Intervenors:

25-1264/25-1266: Entergy Services, LLC, Entergy Arkansas, LLC,

Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New

Orleans, LLC, Entergy Texas, Inc., Louisiana Public Service

Commission,    MISO    Transmission    Owners,    Midcontinent

Independent System Operator, Inc. ("MISO"), Mississippi Public

Service Commission

Amici:

25-1264/25-1266: Public Utility Commission of Texas has filed a notice of intent to participate as *amicus curiae* in support of Respondent.

## II.   Rulings Under Review

The petitioners in Case Nos. 25-1264 and 25-1266 seek review of three orders of the Federal Energy Regulatory Commission:

1.   *Midcontinent Independent System Operator, Inc.*, Order Accepting Tariff Revisions, Subject to Condition, 192 FERC ¶ 61,064, Docket No. ER25-2454-000 (July 21, 2025).

2.   *Midcontinent Independent System Operator, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 192 FERC ¶ 62,185, Docket No. ER25-2454-000 (Sept. 22, 2025).

3.   *Midcontinent Independent System Operator, Inc.*, Order Addressing Arguments Raised on Rehearing, 194 FERC ¶ 61,050, Docket No. ER25-2454-002 (Jan. 22, 2026).

## III.   Related Cases

The petitions on review in Case Nos. 25-1264 and 25-1266 have not previously been before this Court or any other court.

Case Nos. 25-1265 and 25-1267 are currently before this Court and related within the meaning of D.C. Cir. Rule 28(a)(1)(C).

## DISCLOSURE STATEMENTS

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

Clean Wisconsin, founded in 1970, is a state non-profit organization with 25,000 members across Wisconsin. From cleaner air to safer water, Clean Wisconsin's goal is to make Wisconsin a healthier place to live using research-backed advocacy. As part of this advocacy, Clean Wisconsin has advocated for the implementation of state clean energy goals in order to provide clean air and water, local jobs, and household energy savings. Clean Wisconsin also works to achieve the modern, resilient grid needed to connect communities with clean energy. Clean Wisconsin has no parent companies, subsidiaries, or affiliates and has not issued shares or other securities to the public. No publicly held corporation owns any stock in Clean Wisconsin.

Natural Resources Defense Council, Inc. is a national non-profit corporation with members residing in each of the fifty United States. The Natural Resources Defense Council is dedicated to safeguarding the Earth: its people, its plants and animals, and the natural systems

iv

on which all life depends. Additionally, the Natural Resources Defense Council works to achieve energy solutions that will lower consumer energy bills, meet federal and state carbon reduction goals, accelerate the use of renewable energy, and ensure that clean energy is affordable and accessible to all. The Natural Resources Defense Council has no parent companies, subsidiaries, or affiliates and has not issued shares or other securities to the public. No publicly held corporation owns any stock in the Natural Resources Defense Council.

The Sierra Club, founded in 1892, is a national organization with more than 60 chapters and over three million members and supporters. The Sierra Club's purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments. Part of the Sierra Club's current work focuses on environmental and public health problems associated with energy generation. Sierra Club frequently advocates for wholesale market designs and rules that facilitate fair participation by renewable energy resources, demand-side management, and storage. Sierra Club advocates for rules that do not

v

give undue preference to fossil fuel generation in a manner that increases costs to consumers without commensurate benefits.  Sierra Club has no parent companies, subsidiaries, or affiliates and has not issued shares or other securities to the public. No publicly held corporation owns any stock in Sierra Club.

Advanced Energy United is a non-profit 501(c)(6) organization incorporated in the District of Columbia. No entity has any ownership interest in Advanced Energy United. Advanced Energy United does not have any outstanding shares or debt securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

The American Clean Power Association is a non-profit 501(c)(6) organization incorporated under the laws of the District of Columbia. No entity has any ownership interest in the American Clean Power Association. The American Clean Power Association does not have any outstanding shares or debt securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

Clean Grid Alliance is a non-profit 501(c)(3) organization incorporated under the laws of the State of Minnesota. As such, no entity holds any ownership interest in it. Clean Grid Alliance does not have any outstanding shares or debt securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

The Solar Energy Industries Association is a tax-exempt trade association pursuant to 26 U.S.C. § 501(c)(6). The Solar Energy Industries Association has no parent corporation and no publicly held company owns 10% or more of its stock.

**Respectfully submitted,**

*/s/ Nicholas M. Gladd*

Nicholas M. Gladd
Wilson Sonsini Goodrich & Rosati
1700 K Street NW
Washington, DC 20006
Telephone: (202) 973-8800
Email: ngladd@wsgr.com

*Counsel for Advanced Energy United,*
*American Clean Power Association,*
*Clean Grid Alliance, and Solar Energy*
*Industries Association*

Ada Statler
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
Telephone: (415) 217-2091
Email: astatler@earthjustice.org

*Counsel for Clean Wisconsin and
Natural Resources Defense Council*

GREGORY E. WANNIER
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5646
Email: greg.wannier@sierraclub.org

*Counsel for Sierra Club*

Dated: April 17, 2026

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................i

I.      Parties, Intervenors, and *Amici*........................................i

II.     Rulings Under Review ...............................................ii

III.    Related Cases ........................................................ii

DISCLOSURE STATEMENTS...............................................iv

TABLE OF AUTHORITIES................................................xii

GLOSSARY ...........................................................xviii

PERTINENT STATUTORY PROVISIONS............................xx

INTRODUCTION.......................................................... 1

JURISDICTIONAL STATEMENT ......................................6

STATEMENT OF THE ISSUES........................................ 7

STATEMENT OF THE CASE ...........................................9

I.      The Statutory Prohibition on Undue Discrimination .....................9

II.     Initial ERAS Proposal.............................................13

III.    Revised ERAS Proposal ..........................................16

STANDING ............................................................21

I.      Clean Energy Petitioners...........................................21

II.     Public Interest Petitioners........................................24

SUMMARY OF ARGUMENT ...........................................29

ARGUMENT ...........................................................32

I.    ERAS Violates the Federal Power Act's Prohibition on Undue Discrimination, and FERC Does Not Adequately Explain Its Contrary Conclusion. ..................................32

    A.    ERAS Provides Retail Authorities an Unchecked Ability to Unduly Discriminate. ..........................................34

        1.    FERC Failed to Address the Argument that Retail Authority Verification Does Not Materially Distinguish Among Generation Projects. ....................35

        2.    The Orders Unduly Discriminate Among Otherwise Identical Generators Based on the Non-Material Distinction of Retail Authority Verification. .............................................................37

        3.    The Orders Impermissibly Delegate FERC's Obligations Under the Federal Power Act to Retail Authorities. ..........................................................44

    B.    FERC Did Not Adequately Consider Arguments that ERAS Projects Received Financial Benefits at the Expense of End-Use Customers and Projects in the Standard Interconnection Process. .......................................46

II.   FERC Erred in Concluding that ERAS is Narrowly Tailored. .....51

    A.    FERC Failed to Support Its Approval of a System-Wide ERAS Cap that Fails to Limit Unneeded Projects. ..............52

        1.    FERC Did Not Provide a Reasoned Explanation for the 68-Project Cap and Arbitrarily Approved a Cap Not Tethered to Need. ...........................................53

        2.    FERC's "Balancing" Failed to Consider Costs Caused by ERAS Projects, or to Properly Explain the Factors It Did Consider. .......................................56

    B.    FERC Erroneously Dismissed Arguments That ERAS Is Open to Resources that Will Not Come Online in the Near-Term. ..........................................................................58

1.  FERC Failed to Ensure That ERAS Screens For Projects Ready to Commence—and Complete—Construction. ...............................................60

2.  FERC Unlawfully Departed from Its Recent Decision Emphasizing Ability to Timely Complete Construction. ...............................................62

3.  FERC Failed to Consider Evidence that the Standard Interconnection Process Can Timely Fill the Identified Need ...............................................63

III.  REMEDY ...............................................66

A.  The Court Should Vacate FERC's Orders Accepting ERAS. ...............................................66

B.  The Court Should Vacate FERC's Orders but Leave FERC Free to Consider Equitable Resolution of Its Errors ...............................................66

C.  In the Alternative, the Court Should Remand Without Vacatur ...............................................69

CONCLUSION ...............................................70

CERTIFICATE OF COMPLIANCE ...............................................72

CERTIFICATE OF SERVICE ...............................................73

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied-Signal v. Nuclear Regul. Comm'n,*
　　988 F.2d 146 (D.C. Cir. 1993)........................................................... 69

*Am. Fed. Gov't Emps., Local 2924 v. FLRA,*
　　470 F.3d 375 (D.C. Cir. 2006) ........................................................... 60

*Am. Great Lakes Ports Ass'n v. Schultz,*
　　962 F.3d 510 (D.C. Cir. 2020)........................................................... 69

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety
Admin.,*
　　724 F.3d 243 (D.C. Cir. 2013)................................................... 21, 24

*Associated Gas Distribs. v. FERC,*
　　893 F.2d 349 (D.C. Cir. 1989)........................................................... 66

*Burlington N., Inc. v. United States,*
　　459 U.S. 131 (1982) .................................................................... 67, 68

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.,*
　　132 F.4th 535 (D.C. Cir. 2025) ........................................................ 69

*City & Cnty. of San Francisco v. FERC,*
　　24 F.4th 652 (D.C. Cir. 2022) .................................................... 51, 57

*City of Port Isabel v. FERC,*
　　130 F.4th 1034 (D.C. Cir. 2025) ...................................................... 69

*Cogentrix Energy Power Mgmt., LLC v. FERC,*
　　24 F.4th 677 (D.C. Cir. 2022)........................................................... 67

*Consol. Edison Co. of N.Y., Inc. v. FERC,*
　　45 F.4th 265 (D.C. Cir. 2022)........................................................... 34

*Diamond Alt. Energy, LLC v. EPA,*
　　606 U.S. 100 (2025) ...................................................... 22, 23, 24, 28

*El Paso Elec. Co. v. FERC,*
  76 F.4th 352 (5th Cir. 2023)..........................................................43

*Emera Maine v. FERC,*
  854 F.3d 9 (D.C. Cir. 2017) ..........................................................58

*Env't Action v. FERC,*
  996 F.2d 401 (D.C. Cir. 1993)........................................................28

*Evergy Kan. Cent., Inc. v. FERC,*
  77 F.4th 1050 (D.C. Cir. 2023) ....................................................... 7

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...................................................... 31, 55, 62

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ......................................................................32

*Fred Meyer Stores, Inc. v. NLRB,*
  865 F.3d 630 (D.C. Cir. 2017)........................................................64

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.,*
  528 U.S. 167 (2000) ................................................................ 24, 28

*Gratz v. Bollinger,*
  539 U.S. 244 (2003) ................................................................ 23, 42

*Hughes v. Talen Energy Mktg., LLC,*
  578 U.S. 150 (2016) ......................................................................45

*In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.,*
  853 F. Supp. 2d 138 (D.D.C. 2012)................................................70

*IRS v. FLRA,*
  963 F.2d 429 (D.C. Cir. 1992).......................................................60

*Ky. Mun. Energy Agency v. FERC,*
  45 F.4th 162 (D.C. Cir. 2022)........................................................59

*La. Pub. Serv. Comm'n v. FERC,*
  866 F.3d 426 (D.C. Cir. 2017)........................................................67

*Lincoln v. Vigil,*
       508 U.S. 182 (1993) ........................................................................ 43

*Long Island Power Auth. v. FERC,*
       27 F.4th 705 (D.C. Cir. 2022) ........................................................ 66

*Loving v. IRS,*
       742 F.3d 1013 (D.C. Cir. 2014) ................................................. 4, 34

*Lujan v. Defenders of Wildlife,*
       504 U.S. 555 (1992) ........................................................................ 22

*Midwest ISO Transmission Owners v. FERC,*
       373 F.3d 1361 (D.C. Cir. 2004) ........................................................ 9

*Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.,*
       341 U.S. 246 (1951) ........................................................................ 67

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut.*
       *Auto. Ins. Co.,*
       463 U.S. 29 (1983) .................................................................... 32, 47

*Mun. Light Bds. of Reading & Wakefield v. FPC,*
       450 F.2d 1341 (D.C. Cir. 1971) ...................................................... 28

*N. States Power Co. v. FERC,*
       30 F.3d 177 (D.C. Cir. 1994) .......................................................... 65

*Nat. Gas Clearinghouse v. FERC,*
       965 F.2d 1066 (D.C. Cir. 1992) ...................................................... 67

*Nat'l Fuel Gas Supply Corp. v. FERC,*
       468 F.3d 831 (D.C. Cir. 2006) ........................................................ 53

*NCAA v. Bd. of Regents of Univ. of Okla.,*
       468 U.S. 85 (1984) .......................................................................... 40

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v.*
       *City of Jacksonville,*
       508 U.S. 656 (1993) ........................................................................ 23

*New England Power Generators Ass'n, Inc. v. FERC,*
    881 F.3d 202 (D.C. Cir. 2018) .............................................................. 37

*New York v. FERC,*
    535 U.S. 1 (2002) ................................................................................... 9

*NextEra Energy Res., LLC v. FERC,*
    118 F.4th 361 (D.C. Cir. 2024) ........................................................... 36

*Pac. Gas & Elec. Co. v. FERC,*
    373 F.3d 1315 (D.C. Cir. 2004) ........................................................... 66

*PSEG Energy Res. & Trade LLC v. FERC,*
    360 F.3d 200 (D.C. Cir. 2004) ....................................................... 29, 36

*Transmission Agency of N. Cal. v. FERC,*
    628 F.3d 538 (D.C. Cir. 2010) .................................................. 3, 9, 29

*U.S. Telecom Ass'n v. FCC,*
    359 F.3d 554 (D.C. Cir. 2004) ..................................................... 30, 44

*Xcel Energy Servs., Inc. v. FERC,*
    41 F.4th 548 (D.C. Cir. 2022) ..................................................... 33, 34

*Xcel Energy Servs. Inc. v. FERC,*
    815 F.3d 947 (D.C. Cir. 2016) ............................................................ 28

*XO Energy MA, LP v. FERC,*
    77 F.4th 710 (D.C. Cir. 2023) ............................................................ 67

## ADMINISTRATIVE DECISIONS

*Building for the Future Through Elec. Reg'l Transmission
    Planning and Cost Allocation,* Order No. 1920,
    187 FERC ¶ 61,068 (2024) ................................................................. 27

*Entergy Servs., Inc.,*
    120 FERC ¶ 61,020 (2007) ................................................................. 44

*Improvements to Generator Interconnection Procs. &
     Agreements*, Order No. 2023,
     184 FERC ¶ 61,054 (2023) ....................................................... 11, 32

*ISO New England Inc. v. Bangor Hydro-Elec. Co.*,
     161 FERC ¶ 61,031 (2017) ............................................................ 68

*Midcontinent Indep. Sys. Operator, Inc.*,
     169 FERC ¶ 61,221 (2019) ............................................................ 13

*Midcontinent Indep. Sys. Operator, Inc.*
     178 FERC ¶ 61,141 (2022) ......................................................... 2, 64

*Midcontinent Indep. Sys. Operator, Inc.*,
     191 FERC ¶ 61,131 (2025) ..................................... 3, 12, 13, 14, 15,
     16, 30, 38, 51, 52,
     54, 55

*Midcontinent Indep. Sys. Operator, Inc.*,
     193 FERC ¶ 61,168 (2025) ............................................................ 17

*PJM Interconnection, LLC*,
     190 FERC ¶ 61,084 (2025) .............................................. 33, 62, 63

*Standardization of Generator Interconnection Agreements
     and Procs.*, Order No. 2003,
     104 FERC ¶ 61,103 (2003) ........................................ 10, 11, 12, 32

## STATUTES

5 U.S.C. § 706 ............................................................................... 7, 8

5 U.S.C. § 706(2) ........................................................................ 32, 34

16 U.S.C. § 824d ...................................................................... 6, 9, 41

16 U.S.C. § 824d(a) ................................................................... 1, 3, 4

16 U.S.C. § 824d(b) .................................................................. 7, 8, 32

16 U.S.C. § 824e ................................................................................ 9

16 U.S.C. § 825*l*(a)................................................................... 6, 7

16 U.S.C. § 825*l*(b)............................................................. 6, 7, 34

28 U.S.C. § 2349 ....................................................................... 68

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. § 706 |
| Associations | Collectively, Advanced Energy United, American Clean Power Association, Clean Grid Alliance, and Solar Energy Industries Association |
| Denial Order | *Midcontinent Independent System Operator, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 192 FERC ¶ 62,185 (2025) |
| EPA | Environmental Protection Agency |
| ERAS | Expedited Resource Addition Study |
| FERC | Federal Energy Regulatory Commission |
| Initial ERAS Order | *Midcontinent Independent System Operator, Inc.*, Order Rejecting Tariff Revisions, 191 FERC ¶ 61,131 (2025) |
| JA | Page number in the Joint Appendix (deferred) |
| MISO | Midcontinent Independent System Operator, Inc. |
| Order | *Midcontinent Independent System Operator, Inc.*, Order Accepting Tariff Revisions Subject to Condition, 192 FERC ¶ 61,064 (2025) |
| Orders | Collectively, the Order, Denial Order, and Rehearing Order |
| P | Paragraph number in a FERC order |

Petitioners            Collectively, Advanced Energy United,
                       American Clean Power Association, Clean Grid
                       Alliance, Solar Energy Industries Association,
                       Clean Wisconsin, Natural Resources Defense
                       Council, and Sierra Club

PJM                    PJM Interconnection, L.L.C.

Public Interest        Collectively, Clean Wisconsin, Natural
Petitioners            Resources Defense Council, and Sierra Club

R.                     Entry number in the Certified Index to the
                       Record

Rehearing Order        *Midcontinent Independent System Operator,
                       Inc.*, Order Addressing Arguments Raised on
                       Rehearing, 194 FERC ¶ 61,050 (2026)

Retail Authorities     Relevant Electric Retail Regulatory Authorities

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum

attached to this Brief.

## INTRODUCTION

This case involves a new, discriminatory process for interconnecting electricity generation projects to the power grid, called the Expedited Resource Addition Study ("ERAS"). ERAS lets certain facilities jump ahead of the many other generators already awaiting interconnection. The ERAS rules that the Federal Energy Regulatory Commission ("FERC" or "Commission") approved in the Orders on review (1) award valuable preferences in a manner that is "unduly discriminatory," in violation of the Federal Power Act, 16 U.S.C. § 824d(a); (2) unlawfully outsource the selection of projects for that preference to self-interested third parties; and (3) are otherwise arbitrary and capricious. Accordingly, this Court should vacate FERC's Orders approving the ERAS process.

The benefit of being catapulted to the front of the interconnection queue is undeniable. ERAS grants up to 68 new generation projects the benefit of their own individual studies, with the promise of an executed contract within 90 days after selection. *See* Order at P 14, JA____(R.108_6). By contrast, other requests to interconnect new generation to the power grid are studied in groups in the standard

1

interconnection queue, a process that can take years. *Midcontinent Indep. Sys. Operator, Inc.*, 178 FERC ¶ 61,141, at P 13 (2022).

That timing advantage comes with financial upside. When new generation projects[1] seek to connect to the transmission grid, the Midcontinent Independent System Operator, Inc. ("MISO") determines whether there is sufficient transmission "headroom," *i.e.*, existing transmission system capacity, for a project to interconnect. ERAS Filing, Tariff, Attachment X, §§ 3.2.1.2 and 3.2.2.2., JA__-__(R.1_521-22), JA___(R.1_523). If so, the project may proceed—if not, the project must pay to construct such capacity. *Id.*, Tariff, Attachment X, § 3.1, JA__(R.1_520). Jumping the line via ERAS lets a generation project use existing headroom and proceed to operation, rather than paying to construct additional capacity and delaying operation until upgrades are complete.

Because these accelerated slots are so valuable, the process for allocating them is critical. Yet, in this case, FERC approved a process that is patently unlawful. Under the Federal Power Act, FERC must

---

[1] This Brief uses "generation" to include electric storage resources, which are also eligible for ERAS.

2

ensure that wholesale electric and transmission rates are just, reasonable, and not unduly discriminatory. 16 U.S.C. § 824d(a). ERAS falls short of that standard.

As one commissioner explained in the Initial ERAS Order, a two-tiered interconnection process "by definition ask[s] to greenlight discrimination." *Midcontinent Indep. Sys. Operator, Inc.*, 191 FERC ¶ 61,131 (2025) (See, Comm'r, concurring at P 2) ("Initial ERAS Order"). Certain projects will receive the time and money advantages that ERAS awards; others will not. To permit such discrimination, FERC needed to find that the generation projects being treated differently were not "similarly situated." *See Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 549 (D.C. Cir. 2010). It did not make that finding (nor could it; they *are* similarly situated). Moreover, FERC has long held that open access—*i.e.*, giving competitors equal access to the power grid, and thus the market, which in turn tempers costs for consumers—is necessary for rates to be just and reasonable, and not unduly discriminatory or preferential. *See* Initial ERAS Order, 191 FERC ¶ 61,131, at P 203. In approving ERAS, FERC broke from these bedrock requirements, without

making any findings that the discrimination produced by ERAS is justifiable.

That failure is particularly glaring in light of the novel criterion FERC approved for selecting ERAS projects. Specifically, FERC outsourced to third parties the decision of whether to "verify" a project for preferential treatment under ERAS. Though FERC calls these third-party entities "Relevant Electric Retail Regulatory Authorities" (or "Retail Authorities"), in many areas these "authorities" are not State regulatory commissions, but generation-owning utilities. *See* Associations Rehearing Request at 24-25, JA___-__(R.112_24-25). These Retail Authorities *compete with other entities for interconnection*, encouraging self-dealing by providing verification to their own generation projects to secure valuable ERAS slots. The fox is not just guarding the henhouse; it is inside it. *Cf. Loving v. IRS*, 742 F.3d 1013, 1022 (D.C. Cir. 2014).

More fundamentally, no matter which kind of Retail Authority makes the verification decision, FERC's hand-off of that vital decision to third parties abdicates *its* statutory duty to ensure that processes it approves are just, reasonable, and not unduly discriminatory. 16 U.S.C.

§ 824d(a). FERC cannot justify that abdication, nor its failure to explain how ERAS is not unduly discriminatory.

Beyond those statutory violations, the Orders are beset by unsupported determinations. FERC improperly concluded that ERAS's departures from open access requirements were "narrowly tailored" to meet near-term reliability concerns, contradicting record evidence that ERAS's supposed safeguards would not result in effective limitations. For example, ERAS's individualized study design granted selected generation projects excessive financial advantages, while shifting costs to consumers. Similarly, the numerical cap on generation projects did nothing to ensure that ERAS only approved the number of projects truly required to address resource gaps. And finally, ERAS's flexibility around generation projects' timelines failed to ensure that they would come online during the near-term timeframe of MISO's alleged resource needs—which are largely driven by quick-to-build new electricity users like data centers. *See* Order at P 32, JA____-__(R.108_14-15).

All agree that FERC may act to meet unexpected, near-term resource needs. But the Federal Power Act's prohibition on "unduly discriminatory" rates and FERC's duty under the Administrative

Procedure Act ("APA") to adequately justify its decisions require FERC to meet *true needs*—rather than awarding preferential treatment to favored players without justification. Because the challenged Orders violate those bedrock principles, Petitioners Advanced Energy United, the American Clean Power Association, Clean Grid Alliance, and Solar Energy Industries Association ("Associations"), and Petitioners Clean Wisconsin, Natural Resources Defense Council, and Sierra Club ("Public Interest Petitioners"), respectfully request that the Orders be vacated.

## JURISDICTIONAL STATEMENT

Petitioners seek review of three FERC orders: the Order, the Denial Order, and the Rehearing Order (together, the "Orders"). Order, JA___(R.108); Denial Order, JA___(R.115); Rehearing Order, JA___(R.121). This Court has jurisdiction over these petitions under Federal Power Act § 313(b), 16 U.S.C. § 825*l*(b). FERC had subject matter jurisdiction to issue those Orders (which address MISO's request to change rates set out in its Tariff) under 16 U.S.C. § 824d.

On August 20, 2025, Petitioners filed timely requests for rehearing of the Order under 16 U.S.C. § 825*l*(a). *See* Rehearing Order at P 1, JA___(R.121_1). On September 22, 2025, FERC issued the Denial Order,

deeming rehearing denied by operation of law under 16 U.S.C. § 825*l*(a). *See* Denial Order, JA___(R.115_1). Petitioners timely petitioned for judicial review on November 18, 2025. *See* Doc. # 2146077, Public Interest Petition for Review (Sept. 22, 2025); Doc. # 2146418, Clean Energy Associations' Petition for Review. On January 22, 2026, FERC issued the Rehearing Order. *See* Rehearing Order, JA___(R.121). Because the Rehearing Order modified the Denial Order, this Court has jurisdiction over Petitioners' challenge to that decision too. *See Evergy Kan. Cent., Inc. v. FERC*, 77 F.4th 1050, 1054-55 (D.C. Cir. 2023).

This Court has jurisdiction over the petitions for review under 16 U.S.C. § 825*l*(b).

## STATEMENT OF THE ISSUES

1. Whether FERC violated the APA, 5 U.S.C. § 706, and the Federal Power Act's prohibition on undue discrimination, 16 U.S.C. § 824d(b), where the Orders failed to address arguments that ERAS allows similarly situated interconnection applicants to be treated differently.

2. Whether FERC violated the APA, 5 U.S.C. § 706, and the Federal Power Act's prohibition on undue discrimination, 16 U.S.C.

§ 824d(b), where the Orders permitted differential treatment between similarly situated interconnection applicants.

3. Whether FERC violated the Federal Power Act's prohibition on undue discrimination, 16 U.S.C. § 824d(b), where the Orders impermissibly delegated FERC's statutory obligations to Retail Authorities.

4. Whether FERC violated the APA, 5 U.S.C. § 706, because the Orders arbitrarily permitted ERAS projects to receive excessive financial benefits, at the expense of customers and projects in the standard interconnection process.

5. Whether FERC violated the APA, 5 U.S.C. § 706, because the Orders failed to show or otherwise support how the proposed system-wide cap on ERAS projects is narrowly tailored to meet resource adequacy needs.

6. Whether FERC violated the APA, 5 U.S.C. § 706, because the Orders failed to explain or otherwise support how the ERAS process is structured to meet its stated goal of filling an urgent resource need.

8

## STATEMENT OF THE CASE

### I.   The Statutory Prohibition on Undue Discrimination

The Federal Power Act requires FERC to prevent public utilities from unduly discriminating amongst customers in the provision of transmission service. 16 U.S.C. §§ 824d, 824e. "Undue discrimination" occurs when a public utility treats similarly situated entities differently. *Transmission Agency of N. Cal.*, 628 F.3d at 549. This appeal involves undue discrimination in accessing the transmission grid via the "interconnection" process, which limits competitive entry into electricity markets.

In the mid-1990s, FERC found that public utilities, which generally owned both transmission and generation, were exploiting their monopoly control over the transmission system to favor their own generation. *See New York v. FERC*, 535 U.S. 1, 11 (2002). To prevent undue discrimination, FERC "required utilities that owned transmission facilities to guarantee all market participants non-discriminatory access to those facilities." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004). Under FERC's "open access" regime, public utilities must provide transmission service to any eligible customer at the

9

same rates, terms, and conditions that the utility provides to itself. *Midwest ISO Transmission Owners*, 373 F.3d at 1363-64.

Several years later, FERC standardized its approach to open access to the transmission system for independent generators to interconnect and to sell their electricity. FERC explained that "interconnection is a critical component of open access transmission service," because "open access" to transmission service is possible only if independent generation developers can interconnect in the first instance. *Standardization of Generator Interconnection Agreements and Procs.*, Order No. 2003, 104 FERC ¶ 61,103, at PP 9, 12 (2003).

Generator interconnection is complicated, involving a series of engineering studies to identify upgrades to the transmission system to reliably accommodate a new generator. In Order No. 2003, FERC concluded that this complexity risked undue discrimination. *See id.* P 11. That is true because the order in which generators are studied, and the assumptions underlying those studies, determine whether and which transmission upgrades are deemed necessary to facilitate interconnection. *See id.* P 677. FERC responded to that risk by requiring public utilities to use standardized "*pro forma*" procedures and

agreements to process interconnection requests. FERC explained that these procedures would "(1) limit opportunities for Transmission Providers to favor their own generation, (2) facilitate market entry for generation competitors by reducing interconnection costs and time, and (3) encourage needed investment in generator and transmission infrastructure." Order No. 2003, 104 FERC ¶ 61,103, at P 12 (2003).

Since that time, FERC has updated these *pro forma* procedures to preserve open access to the transmission system amidst changing industry conditions. Most recently, FERC found that grid operators' practices were not keeping pace with the increasing numbers of requests for interconnection. *See Improvements to Generator Interconnection Procs. & Agreements*, Order No. 2023, 184 FERC ¶ 61,054, at PP 42-43 (2023). FERC thus required that requests be studied in groups called clusters, shifting away from one-at-a-time interconnection studies. *Id.* P 5. In so doing, FERC rejected calls to allow transmission providers to operate multiple queues at once because "a separate interconnection process outside the cluster study process could detract from transmission providers' efforts to efficiently process cluster studies." *Id.* P 178.

This proceeding involves efforts by MISO to establish a deviation from FERC's standardized, cluster-based interconnection process. MISO operates the transmission system and wholesale electricity markets for much of the central United States. In that role, MISO must file with FERC an open access transmission tariff that sets forth the rules, procedures, and *pro forma* agreements that govern the systems under MISO's control. *See* Order No. 2003, 104 FERC ¶ 61,103, at P 910. MISO's existing, standard interconnection process is consistent with FERC's cluster study concept. Initial ERAS Order, 191 FERC ¶ 61,131, at P 4. In that process, MISO identifies transmission upgrades that are needed to safely and reliably interconnect the cluster of proposed generators to the transmission system.[2]

Grid operators may deviate from FERC's standard interconnection rules, as MISO did here, only if their deviations meet FERC's "independent entity variation" standard. Under that standard, MISO must demonstrate that the deviation: (1) accomplishes the purpose of FERC's interconnection rules; and (2) is just and reasonable and not

---

[2] In the Orders and underlying record, MISO's standard interconnection process is called the Definitive Planning Process or DPP.

unduly discriminatory or preferential under section 205 of the Federal Power Act. *Midcontinent Indep. Sys. Operator, Inc.*, 169 FERC ¶ 61,221, at P 18 (2019). Thus, while MISO has some flexibility in administering its generator interconnection process, it must still satisfy the Commission's open access policy and the statutory prohibition on undue discrimination.

## II.    Initial ERAS Proposal

In March 2025, MISO filed its first ERAS proposal to establish a generator interconnection "fast lane," which would operate separately from its standard interconnection process. In support, MISO asserted that it faced urgent challenges "arising because of continued electrification efforts, a resurgence in manufacturing, and an unexpected demand for energy-hungry data centers to support artificial intelligence[.]" Initial ERAS Proposal at 3, FERC Docket No. ER25-1674, Accession No. 20250317-5212 (2025) at 3; Initial ERAS Order, 191 FERC ¶ 61,131, at P 26 (2025).

Under the initial proposal, MISO would open a quarterly first-come, first-served study process—a departure from the standard cluster study process—to facilitate the rapid study of generators "committed to

13

addressing specific, identified resource adequacy and/or reliability needs." Initial ERAS Order, 191 FERC ¶ 61,131, at P 8. Selected generators would receive an agreement to interconnect to the transmission system in a fraction of the time it would take under the standard process. *Id.* P 8. ERAS studies would also include different—and more favorable—study assumptions. *Id.* P 145.

Generation projects could participate in ERAS only if the Retail Authority "notified" MISO that the project should be studied on an accelerated basis. *Id.* P 74. The Retail Authority is the entity with jurisdiction over retail electric prices—which could be a state public utility commission, the city council of a municipal utility, or the governing board of a cooperative utility—in the location of the load to be served by the generator. MISO would stop opening application windows after 2028. *Id.* P 11. But there was no limit on the number of ERAS projects.

FERC rejected MISO's proposal. It explained that MISO "ha[d] not demonstrated that its ERAS proposal is a just and reasonable and not unduly discriminatory or preferential approach for addressing MISO's stated resource adequacy and reliability needs." *Id.* P 197. In reaching

that conclusion, FERC found MISO had not adequately shown that ERAS was "narrowly tailored" or "sufficiently targeted" to address only the interconnection requests needed to address the identified reliability issues. *Initial ERAS Order*, 191 FERC ¶ 61,131, at PP 199, 201. For instance, MISO did not propose to limit the number of ERAS requests, nor the total megawatts of those requests. *Id.* P 199. Further, FERC explained that while "it is appropriate for [Retail Authorities] to communicate to MISO their resource adequacy and reliability needs, as well as their support for including interconnection requests in the ERAS process," "[a]t the same time, MISO must ensure that this proposal is aligned with the Commission's open access principles in an objective and transparent manner in order to meet the [Federal Power Act]'s requirements that rates be just and reasonable and not unduly discriminatory or preferential." *Id.* P 203. FERC contrasted ERAS with previous expedited interconnection proposals approved by FERC, which had limitations to prevent undue discrimination and preserve open access. *Id.* P 202.

As one concurring commissioner observed, "where a proposal's goal is [] to get some interconnection requests through the study process faster

15

than others, [FERC] is by definition asked to greenlight discrimination." Initial ERAS Order, 191 FERC ¶ 61,131 (See, Comm'r, concurring at P 2). ERAS's discriminatory treatment was unjustified because the process went "beyond appropriate respect for the States' roles in resource adequacy issues and outsources the expedited study selection process altogether," without proposing any guardrails or other mechanism to determine whether "[Retail Authorities] compared similarly situated projects or how it chose" among those generation projects. *Id.* (See, Comm'r, concurring at P 6). That was problematic because "MISO is the regulated entity, not the States, and the [Federal Power Act] require[s] us to evaluate [*MISO's*] processes." *Id.* (See, Comm'r, concurring at P 7).

## III.   Revised ERAS Proposal

Just weeks after FERC's initial rejection, MISO refiled its ERAS proposal. MISO retained the same basic features of the initial proposal, with minor additions to address certain criticisms in FERC's rejection order.

First, MISO proposed capping the number of generation projects that could be studied at 68 total projects, with ten slots reserved for projects developed by independent power producers and eight slots

16

reserved for projects serving retail choice load. Order at P 16, JA____(R.108_8). MISO originally planned to study a maximum of ten ERAS generation projects per quarter, but later increased that number to fifteen projects per quarter. *See Midcontinent Indep. Sys. Operator, Inc.,* 193 FERC ¶ 61,168 (2025). Second, the revised ERAS proposal reframed the type of Retail Authority support needed to qualify for ERAS. Order at PP 103-104, JA____-__(R.108_52-54). While the first version required the Retail Authority to "notify" MISO that the generator's study should be accelerated, the revised proposal instead required a "verification" from the Retail Authority that the project will meet a resource adequacy need. *Id.* P 104 & n.265, JA___(R.108_53).

FERC accepted the revised ERAS proposal, finding that it was just and reasonable and not unduly discriminatory or preferential and met FERC's "independent entity variation" standard. *Id.* P 31, JA____(R.108_13). FERC credited assertions of "near term resource adequacy needs" and "upcoming load needs" within MISO's footprint. *Id.* P 82, JA___(R.108_40). Several parties sought rehearing of FERC's Order; FERC's Rehearing Order affirmed the decision.

In the Orders, FERC disagreed that the Retail Authority verification requirement created the potential for undue discrimination, asserting that it had "every reason to expect that state regulators, which are obligated to serve the public interest *in accordance with state law*, will be objective." Rehearing Order at PP 68, 72 (emphasis added) JA___-__(R.121_47-48), JA___-__(R.121_50-51); Order at P 199, JA___-___(R.108_193-94). FERC found that sufficient guardrails were in place—specifically, project eligibility requirements and the fact that ERAS is a one-time, capped program—to protect against undue discrimination. Rehearing Order at P 72, JA____-__(R.121_50-51). And though it acknowledged that some Retail Authorities own generation, it said those entities would be "incentivize[d] [] to administer the [Retail Authority] verification requirement to identify the resources best suited to avoid potential shortfalls," rather than to favor their own generation. *Id.* P 74, JA___-__(R.121_52-53).

FERC also disagreed with Petitioners that ERAS unlawfully subdelegates statutory authority to Retail Authorities, finding that ERAS merely "creates a role for [Retail Authorities] in a Commission-jurisdictional process" in recognition of "states' jurisdictional authority

18

over resource planning and the generation mix within their boundaries." Order at P 101, JA__(R.108_51); Rehearing Order at PP 68-71, 76, JA__-__(R.121_47-50), JA__(R.121_54). It asserted that this role would be subject to FERC's review under Federal Power Act Sections 205 and 206.

FERC likewise disagreed with arguments that the ERAS process would harm generation projects in the standard interconnection queue, finding such concerns "speculative." Order at P 261, JA__(R.108_123); Rehearing Order at P 86, JA__-__(R.121_62-63). Specifically, FERC discounted concerns that ERAS would harm generation projects in future queue cycles—which arose because the prioritization and favorable study assumptions would give ERAS projects greater access to existing headroom on the system, leaving less headroom for future projects in the standard process and subjecting them to higher network upgrade costs. Order at P 262, JA__-__(R.108_123-24); Rehearing Order at PP 86, 88, JA__-__(R.121_62-63), JA__-__(R.121_63-64). Similarly, FERC dismissed concerns that certain upgrades for ERAS projects would be paid for by retail electric customers, stating these processes were

19

consistent with previously approved practices. Order at P 264, JA\_\_\_\_ (R.108_124).

On the need for the revised ERAS proposal, FERC agreed with MISO that improvements to the standard interconnection process were not aimed at meeting MISO's near-term resource adequacy needs and were unlikely to meet those needs. *Id.* P 83, JA\_\_\_-\_\_(R.108_41-42); Rehearing Order at P 65, JA\_\_\_-\_\_(R.121_43-44). FERC rejected concerns that giving ERAS projects six years to enter commercial operation (after applying as late as 2027) meant that they were unlikely to resolve resource adequacy needs emerging "within the next five years"—the stated purpose of the ERAS process. FERC instead concluded that "six years is the worst-case scenario." Order at PP 14, 84, JA\_\_\_-\_\_(R.108_6-7), JA\_\_\_(R.108_42); Rehearing Order at PP 6, 45, 48, JA\_\_\_-\_\_(R.121_3-4), JA\_\_\_-\_\_(R.121_31-32), JA\_\_\_-\_\_(R.121_33-34). In the Rehearing Order, FERC observed that because ERAS projects "will be subject to an expedited interconnection study process," they were "less likely to be subject to study delays" that could arise in the standard process. Rehearing Order at P 47, JA\_\_\_-\_\_(R.121_32-33). But it also found that ERAS would be just and reasonable even if "some" projects

enter commercial operation after 2030. Rehearing Order at P 48, JA___-__(R.121_33-34).

Finally, in response to arguments that the 68-project cap was arbitrary and untailored, FERC concluded that it was "narrowly tailored to meet MISO's near-term resource adequacy and/or reliability needs." Order at P 203, JA___-___(R.108_96-97); Rehearing Order at P 58, JA___-__(R.121_39-40). It said that the 68-project cap "strikes a reasonable balance between ensuring broader participation and addressing the resource adequacy needs of the region, while providing reasonable limitations on the number of interconnection requests that will be studied" and minimizing the potential for delays. Order at P 203, JA___-__(R.108_96-97); Rehearing Order at P 58, JA___-__(R.121_39-40).

## STANDING

### I.     Clean Energy Petitioners

An industry association possesses Article III standing when: "(1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (citation

omitted). For an entity to have standing to sue in its own right, it needs to show "injury in fact, causation, and redressability." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Clean Energy Petitioners easily satisfy the requirements for associational standing. First, each is an industry association whose members would possess standing to sue in their own right. On injury in fact, "[m]onetary costs are of course an injury." *Id.* at 111 (citation omitted), and some members suffer financial harm in the interconnection process from the preferential treatment given to ERAS projects. The financial harm is clear, as ERAS projects—by proceeding more quickly— will use up the existing capacity or "headroom" in the system before others. That will cause lower costs for the ERAS projects (which will not need to build extra capacity) and higher costs for the non-ERAS projects (which will have to pay to upgrade the system to create more capacity). *See* Mindham Decl. ¶ 6, ADD-020. The consequences of this cost shift are dramatic, as upgrade costs for individual projects often reach tens or hundreds of millions of dollars. *See id.*; MISO Independent Power

Producers Protest, Affidavit of Cody Doll, tbl. 1, JA___(R.90_219); Public Interest Initial Protest at 13, JA___(R.91_59).

Further, in cases (like this one) involving a requirement not to unduly discriminate, an additional "'injury in fact' is the inability to compete on an equal footing." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). As the Supreme Court has emphasized, an association challenging the criteria for awarding a limited benefit need not "show that one of its members would have received" the benefit "absent the ordinance in order to establish standing," but only that the selection criteria altered its odds. *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003). Members that participate in the interconnection process thus suffer an injury via the current ERAS process, because FERC unduly discriminates in how it awards ERAS slots. *See* Mindham Decl. ¶ 7, ADD-020.

Those injuries are "directly traceable" to the challenged Orders, which set up both the ERAS process and the terms that make it unduly discriminatory. *See, e.g.*, *Diamond Alt. Energy, LLC*, 606 U.S. at 114 (holding that this element is satisfied where "regulations likely cause [petitioners'] monetary injuries"). Those injuries are likewise

23

redressable, as here the challenged Orders "cause[] injury to" members "that invalidating the [Orders] would" fix. *Diamond Alt. Energy, LLC*, 606 U.S. at 114. For example, if this Court orders vacatur, FERC will need to design a process on remand that does not financially harm members via unfair preferences or subject them to undue discrimination.

With the members' standing secured, the associations' standing follows. Each is designed to "promote and protect the interests of [clean energy producers]," so each "has an obvious interest in challenging [FERC action] that directly—and negatively—impacts its" members. *Am. Trucking Ass'ns, Inc.*, 724 F.3d at 247. And "neither the claim asserted nor the relief requested requires the member to participate in the lawsuit," *id.* (citation omitted), as the alleged injuries are common to all producers subjected to the current ERAS process, and the relief requested—vacatur and/or remand—is directed at the agency regardless of information about any individual producer. Clean Energy Petitioners thus possess Article III standing to challenge the Orders.

## II. Public Interest Petitioners

Public Interest Petitioners are also membership-based organizations that satisfy the test for associational standing. *See Friends*

*of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000). Public Interest Petitioners' members likewise would "have standing to sue in their own right" because they meet Article III's requirements for injury-in-fact, causation, and redressability. *Id.* 180-81.

These members are the end consumers of electricity—"load," in FERC terminology—that ultimately pay for transmission costs incurred in MISO processes that are recovered in utility retail rates. *See, e.g.*, Coelho Decl. ¶ 3, ADD-013; Godwin Decl. ¶ 5, ADD-025; Lemkuil Decl. ¶ 4, ADD-029; Thielen Decl. ¶ 4, ADD-038; Schroeer Decl. ¶ 4, ADD-035; Rogers Decl. ¶ 10, ADD-034. By MISO's own telling, the ERAS proposal shifts the need to construct certain transmission upgrades to planning processes that are paid for by consumers, rather than the interconnection process. Witmeier Testimony at 55:16-18, JA___(R.1_968). *See also* Rehearing Order at P 88, JA___-__(R.121_63-64) (explaining ERAS relies on the transmission expansion process to "ensure that costs associated with network upgrades to resolve constraints are borne by load"). *See also* Public Interest Protest at 17; JA____-__(R.91_19), Public Interest Initial Protest at 20-21, JA__-__(R.91_66-67), Public Interest Initial Protest, Attach. A, Moaveni Testimony at 14-15, JA___-__(R.91_107-08). Absent

25

ERAS, MISO's processes would instead assign the costs for such upgrades to the project developers seeking interconnection.

Indeed, Ms. Godwin, who already struggles to pay her electricity bills, worries about living near two ERAS projects, including a large new gas plant in Marshall, Iowa. Godwin Decl. ¶ 7-8, ADD-026-027. That ERAS power plant is a prime example of the types of double-allocations that ERAS allows, as it seeks interconnection at the same grid substation as two proposed non-ERAS projects.[3] Under the new FERC-approved process, upgrades triggered by such overlaps will be paid for by nearby load like Ms. Godwin, who live in the transmission pricing zone.[4] Other Public Interest Petitioner members also live in transmission pricing

---

[3] *Compare* ERAS Interconnection Request List, https://cdn.misoenergy.org/ERAS%20Interconnection%20Requests7184 81.pdf?v=20250925100448 [https://perma.cc/WRV2-LZ3J] (Project E0010, selected for study in the first ERAS cycle, with point of interconnection at the Twinkle 345kV Substation), *with* Current Queue Activity, https://cloud.cartovista.com/miso/ferc/current-queue-map [https://perma.cc/3RKB-DMMA] (Projects J4056 and J4068, with the point of interconnection at the Twinkle 345kV Substation).

[4] *See Use of "Zones" and "Regions" at MISO* (2021) at 4-5, https://www.misostates.org/images/stories/meetings/Cost_Allocation_Pri nciples_Committee/2021/Website_Presentations.pdf [https://perma.cc/U7MR-FSJV]. For example, Ms. Godwin and nearby generation projects are in the MidAmerican Energy (MEC) pricing zone.

zones near proposed ERAS projects. *See* Lemkuil Decl. ¶ 8, ADD-030; Coelho Decl. ¶ 19, ADD-016; Thielen Decl. ¶ 8, ADD-039; Schroeer Decl. ¶ 8, ADD-036. Mr. Coelho, a Wisconsin resident where there are four planned ERAS projects, is concerned that "increased electricity demand from data centers may further drive up my utility rates," and does not want "to be forced to pay for the grid upgrades required to accommodate ERAS power plants." Coelho Decl. ¶¶ 6, 20, ADD-013, ADD-016.

ERAS is also likely to increase overall transmission upgrade costs. Specifically, MISO's segmentation of transmission upgrade analyses will likely drive up the total required upgrade costs, as compared to the upgrade costs if all projects were studied together. Public Interest Protest at 17; JA____(R.91_19), Public Interest Initial Protest, Attach. A, Moaveni Testimony at 16-18, JA___-__(R.91_109-11). Some of these costs are ultimately passed from utilities to retail consumers in rates. Indeed, Public Interest Petitioners' concerns mirror the Commission's finding in other contexts that siloed transmission buildout and reliance on piecemeal local projects drives up costs for consumers. *See Building for the Future Through Elec. Reg'l Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068 (2024) at P 100.

27

Again, these "[m]onetary costs are of course an injury." *Diamond Alt. Energy, LLC*, 606 U.S. at 111 (citation omitted); *see also Env't Action v. FERC*, 996 F.2d 401, 406 (D.C. Cir. 1993) (organization's members injured by higher electricity costs). "It is long-established that the 'primary aim [of the Federal Power Act] is the protection of consumers from excessive rates and charges.'" *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952-53 (D.C. Cir. 2016) (quoting *Mun. Light Bds. of Reading & Wakefield v. FPC*, 450 F.2d 1341, 1348 (D.C. Cir. 1971)). These "interests at stake" are "germane" to Public Interest Petitioners' organizational purposes of promoting clean, affordable energy. *See Laidlaw*, 528 U.S. at 181; Rogers Decl. ¶¶ 7-8 ADD-033-ADD-034.

Finally, these injuries would likely "be redressed by a favorable decision" correcting FERC's errors. *Laidlaw*, 528 U.S. at 180-81. If the Court orders vacatur (or in the alternative, remand without vacatur), FERC will need to ensure on remand that the interconnection process and any exceptions to open access are narrowly tailored to preserve just and reasonable rates for customers.

## SUMMARY OF ARGUMENT

This case centers on FERC's statutory responsibility to prevent disparate treatment of "similarly situated" entities that seek to interconnect to the grid. *See Transmission Agency of N. Cal.*, 628 F.3d at 549. FERC failed to do that in approving ERAS—a process designed to grant certain generators preferential access to interconnect to the grid.

FERC's acceptance of ERAS violates the Federal Power Act's prohibition on undue discrimination. As a threshold matter, FERC did not address arguments that its Orders fail to ensure that similarly situated customers are not treated differently. FERC never explained how a Retail Authority's "verification" of a project renders otherwise identical generators not similarly situated, such that it is permissible for one to receive preferential interconnection access over the other. That alone is a flaw sufficient to grant this Petition. *See, e.g.*, *PSEG Energy Res. & Trade LLC v. FERC*, 360 F.3d 200, 205 (D.C. Cir. 2004) ("FERC's failure to respond cogently to [petitioner's] argument … requires granting the [] petition.").

Nor could there be a reasonable explanation, because the risk of undue discrimination is structurally baked into ERAS. Nothing prevents

29

Retail Authorities from treating similarly situated customers differently as they select projects for preferential interconnection treatment. FERC asserts that Retail Authorities will be objective because they serve the "public interest" under state law. Rehearing Order at P 72 & n.271, JA___-__(R.121_50-51). But FERC cannot delegate its responsibility to prevent undue discrimination to outside entities. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004). Even if it could, no state law would prohibit Retail Authorities in the 15 states in MISO's footprint from treating similarly situated entities differently. Moreover, many Retail Authorities are themselves generation-owning utilities that have an incentive to favor their own projects when evaluating ERAS requests. And to make matters worse, the unduly discriminatory and preferential treatment of ERAS projects will harm developers waiting their turn in the standard interconnection process.

FERC's approval of ERAS was also arbitrary and capricious under the APA. FERC rejected the initial ERAS proposal because it was not shown to be "narrowly tailored" to meet the resource adequacy needs MISO identified. Initial ERAS Order, 191 FERC ¶ 61,131, at P 199. Yet

the second ERAS proposal, which FERC accepted, suffers that same fatal flaw.

Indeed, ERAS is not "narrowly tailored" in at least two key respects. First, nothing in the record explains why the 68-project cap is properly calibrated to MISO's resource adequacy needs. Second, the program does not ensure that ERAS projects will come online during the relevant timeframe to meet MISO's purported resource adequacy needs. By approving ERAS despite these critical failures to "narrowly tailor" ERAS to those needs, FERC failed to provide a "reasoned explanation" for disregarding "facts and circumstances that" justified its prior choice. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

In short, the Orders structurally guarantee undue discrimination that will advantage several dozen generation projects to the financial and competitive detriment of all others, while freeing FERC of its statutory responsibility to police undue discrimination. This Court should hold that FERC's Orders are unlawful under both the Federal Power Act and the APA. It should then vacate the Orders or, in the alternative, remand the Orders without vacatur.

31

## ARGUMENT

Under the APA, the Court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). FERC must explain a "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and FERC's decisions must be both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

## I.    ERAS Violates the Federal Power Act's Prohibition on Undue Discrimination, and FERC Does Not Adequately Explain its Contrary Conclusion.

Section 205 of the Federal Power Act requires FERC to ensure that "[n]o public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission … make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage." 16 U.S.C. § 824d(b). For nearly a quarter of a century, FERC has rigorously implemented this statutory prohibition by requiring open access in generator interconnection processes. Order No. 2003, 104 FERC ¶ 61,103, at PP 8-12 (2003); Order No. 2023, 184 FERC ¶ 61,054, at P 37 (2023). As this Court has acknowledged, "[o]ne of

32

the Commission's chief goals in promulgating standard interconnection rules was to minimize opportunities for undue discrimination by transmission operators, and it does that in part by protecting relatively unencumbered entry into the market." *Xcel Energy Servs., Inc. v. FERC*, 41 F.4th 548, 559 (D.C. Cir. 2022) (cleaned up).

FERC has therefore been wary of proposals that open the door to undue discrimination by expediting certain generators' interconnections. When FERC recently accepted expedited generator interconnection procedures to meet a demonstrated reliability need in the PJM Interconnection ("PJM") region, it did so only after concluding that: (1) the processes were narrowly tailored to ensure comparable access to interconnection service for resources seeking to show they are capable of meeting the identified reliability need; and (2) the proposal minimized harm to other interconnection customers that could not participate in the expedited process. *PJM Interconnection, LLC*, 190 FERC ¶ 61,084 at PP 123, 245 (2025). In other words, to the extent FERC countenances discrimination through expedited interconnection queues, that discrimination must be closely scrutinized to ensure it is due. *See id.* (Rosner & Phillips, Comm'rs, concurring at P 2).

33

### A. ERAS Provides Retail Authorities an Unchecked Ability to Unduly Discriminate.

FERC's Orders violate the Federal Power Act's prohibition on undue discrimination. 5 U.S.C. § 706(2)(E); 16 U.S.C § 825*l*(b). This Court must "tak[e] seriously, and apply[] rigorously, in all cases, statutory limits on agencies' authority." *Loving*, 742 F.3d at 1022. Undue discrimination occurs when similarly situated entities are treated differently without good reason. *Consol. Edison Co. of N.Y., Inc. v. FERC*, 45 F.4th 265, 282 (D.C. Cir. 2022). When evaluating whether resources are similarly situated, it is not enough for those resources to be different in any respect; rather, they must be different with respect to the inquiry at hand. *See Xcel Energy Servs., Inc.*, 41 F.4th at 559-60.

The Orders violate that statutory requirement in three related ways. *First*, FERC did not address the argument that ERAS allows for discrimination based on Retail Authority verification, which is not a material difference among projects. That is an independent and conclusive procedural flaw. *Second*, even if FERC had considered that argument, it could not overcome it: Retail Authority verification is not a material difference that justifies greenlighting overt discrimination among interconnection applicants. *Third*, by outsourcing the

34

discriminatory determination to Retail Authorities, FERC violated the statutory requirement that *it* prevent undue discrimination.

### 1. FERC Failed to Address the Argument that Retail Authority Verification Does Not Materially Distinguish Among Generation Projects.

FERC failed to address the argument that the Orders are unduly discriminatory because they allow for similarly situated interconnection applicants to be treated differently. Retail Authority verification is the "ticket to ride" in the ERAS process. If two otherwise identical generators apply for ERAS, but one receives the necessary verification and one does not, only the applicant with the verification is eligible for ERAS. In that sense, it is unquestionably discriminatory.

The question is then whether that discrimination can be justified on the basis that the two applicants are not similarly situated. Associations asserted multiple times in their Rehearing Request that Retail Authority verification is not sufficient to render two identical generators not similarly situated because no standards guide it. Associations Rehearing Request at 20-21, 24-27, JA___-__(R.112_20-21), JA___-__(R.112_24-27); Rehearing Order at P 66, JA___-__(R.121_45-46); *see also* Public Interest Rehearing Request at 19, JA___(R.111_19).

35

Nevertheless, FERC never explained why verification should be sufficient to conclude that otherwise identical generators are not similarly situated, such that it is permissible for only one to receive expedited interconnection. That failure to respond to an argument raised directly on rehearing is itself a basis to grant this Petition. *See, e.g.*, *PSEG Energy Res. & Trade LLC*, 360 F.3d at 205 ("FERC's failure to respond cogently to [petitioner's] argument … requires granting the company's petition").

The closest FERC came to addressing this point is its determination that Retail Authorities play an important role in certain matters that are not within FERC's jurisdiction, including siting of new generation facilities and the states' "independent authority over resource adequacy." Rehearing Order at P 70, JA___-__(R.121_48-49). But no party disputes that Retail Authorities play an important role in the energy industry. Rather, the question is whether the Federal Power Act empowers Retail Authorities to regulate *transmission interconnection service*. The Federal Power Act's text and judicial precedent make clear that the answer is "no." Interconnection service, as a component of transmission service, is squarely within FERC's exclusive jurisdiction. *See NextEra Energy Res.,*

36

*LLC v. FERC*, 118 F.4th 361, 369 (D.C. Cir. 2024) (explaining that a core statutory purpose of the Federal Power Act is ensuring that different generators may safely and reliably connect to the interstate transmission system); Associations Rehearing Request at 21-22, JA___-__(R.112_21-22). The fact that Retail Authorities have regulatory purview over certain matters not within FERC's jurisdiction does not justify allowing them to confer—without review—preferential treatment under a FERC-jurisdictional tariff governing which generators interconnect to the transmission system and how.

The Rehearing Order simply does not address that question and is arbitrary and capricious for failing to respond to that threshold issue. *See, e.g., New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 210-11 (D.C. Cir. 2018).

### 2. The Orders Unduly Discriminate Among Otherwise Identical Generators Based on the Non-Material Distinction of Retail Authority Verification.

The ERAS proposal fails to ensure that Retail Authorities do not unduly discriminate among entities seeking verification. As one dissenting commissioner observed when voting to reject the Initial ERAS Proposal, MISO has no way of knowing whether or how the Retail

37

Authority "compared similarly situated projects or how it chose the ones best positioned to meet near-term resource adequacy needs." Initial ERAS Order, 191 FERC ¶ 61,131 (See, Comm'r, concurring at P 6).

The same is true of the revised ERAS proposal: Nothing in the tariff language addresses the Associations' concern regarding how Retail Authorities may compare similarly situated projects or chose among them. But FERC had an obligation to evaluate MISO's proposed tariff language and affirmatively conclude that it was not unduly discriminatory or preferential. *Id.* (See, Comm'r, concurring at P 7). FERC cannot escape that statutory responsibility by approving a tariff that "greenlights discrimination," by outsourcing the discriminatory decision to a non-jurisdictional entity. Associations Rehearing Request at 24-27, JA___-__(R.112_24-27).

FERC did not contest the fact of the outsourcing. Instead, it found that there is no cause for concern regarding undue discrimination because Retail Authorities will be "objective," meaning that they are "impartial and without bias." Rehearing Order at P 72, JA___-__(R.121_50-51). But there are three flaws with FERC's reasoning that render it arbitrary and capricious.

38

First, FERC offered no support for its conclusion. FERC stated, without support, that Retail Authorities must be objective because they "serve the public interest in accordance with state law." Rehearing Order at P 68 and n.271, JA____-__(R.121_50-51). But FERC did not cite or identify a single state law that prohibits a Retail Authority from treating similarly situated generators differently, much less why the applicable laws in all fifteen states within MISO impose that prohibition, such that FERC could rationally conclude that there will be no undue discrimination. In any case, it is neither explained nor obvious why a Retail Authority could not treat similarly situated entities differently and still conclude, whether rightly or wrongly, that it was acting consistent with the public interest.

Second, as the Associations explained in their Rehearing Request, state governmental entities are not the only Retail Authorities in MISO's footprint. The Retail Authority definition also includes municipal and cooperative utilities, many of which own and develop *their own generation resources*. Those Retail Authorities thus must submit their own requests to interconnect, which gives those Retail Authorities a rational incentive to discriminate against *other* generation developers

39

that may be direct competitors for interconnection access. Associations Rehearing Request at 24-25, JA___-__(R.112_24-25). As such, there is every reason to believe that municipal and cooperative utilities acting as Retail Authorities would discriminate in favor of their generators and against similarly situated competitors.

Here again, FERC did not dispute the potential for undue discrimination, but wrongly dismissed it. FERC insisted that any discrimination is not concerning because municipal and cooperative utilities are "*generally*" not-for-profit and therefore not incentivized to maximize profits. Rehearing Order at P 74, JA____-__(R.121_51-53) (emphasis added). Nevertheless, those entities still have an incentive to discriminate in favor of generation resources in which it is itself invested—or to take other steps that might maximize the revenue it receives from those resources. *Cf. NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 n.22 (1984) ("[T]he economic significance of the NCAA's nonprofit character is questionable at best. Since the District Court found that the NCAA … [is] in fact organized to maximize revenues … it is unclear why petitioner is less likely to restrict output in order to

40

raise revenues above those that could be realized in a competitive market than would be a for-profit entity." (citation omitted)).

FERC's effort to minimize this issue fares no better. FERC claimed that because cooperative and municipal utilities are just a subset of the potential Retail Authorities, their involvement in the ERAS process will be further limited, even as compared to the limited 68-project scope of the ERAS process overall. Rehearing Order at P 74 n.276, JA____(R.121_52). As a baseline, FERC's assumption of minimal utility Retail Authority projects was speculative.[5] The Federal Power Act does not, moreover, contain a *de minimis* exception to the prohibition on undue discrimination. 16 U.S.C. § 824d. In short, the non-profit status of some (although perhaps not all) municipal and cooperative utilities is not a reasoned basis for brushing aside concerns about their potential exercise of undue discrimination.

Third, FERC pointed to other factors that limit a generator's eligibility to use the ERAS process. First, it focused on the application

---

[5] Indeed, 15% of the projects currently in the ERAS process are owned by or will serve municipal and cooperative utilities—hardly a *de minimis* amount. *See* https://cdn.misoenergy.org/ERAS%20Interconnection%20R equests718482.xlsx?v=20250925100619 [https://perma.cc/VA5U-FXHY].

41

process, which is "open, competitive, technology/fuel agnostic, and does not involve MISO favoring or selecting certain projects over others." Rehearing Order at P 72, JA___-__(R.121_50-51). This is non-responsive to Associations' well-founded concern that resources can apply to receive the ERAS preference, but be denied that preference because of the unreviewable choices a Retail Authority makes among similarly situated entities. As the Associations explained on rehearing, "pointing to the fact that ERAS is open to a wide range of resources is the equivalent of a university responding to claims of gender bias in its admissions process by noting that both men and women are equally capable of submitting an application. That may be true, but it misses the point entirely. The question is who gets selected and why, not who is free to apply." Associations Rehearing Request at 26, JA___(R.112_26); *cf. Gratz*, 539 U.S. at 262 (issue is not who can formally apply, but denial of "opportunity to compete…on an equal basis"). FERC's Rehearing Order did not respond to that point.

Next, FERC noted limits on ERAS, including that it is a "one-time process" "capped at a defined number of interconnection requests," and limited to projects that meet MISO's various eligibility requirements.

42

Rehearing Order at P 72, JA____-__(R.121_50-51). But the fact that the undue discrimination could be even greater without these limitations is not a reasoned response to the arguments that ERAS is unduly discriminatory.

FERC also attempted to downplay the potential for undue discrimination via the Retail Authority requirement by describing it as "limited and discrete." But, as FERC itself recognized, while verification may not be sufficient by itself, it is a *necessary* requirement for ERAS eligibility. For that reason, the fact that Retail Authorities "are already constrained to verifying only those interconnection requests that meet the eligibility criteria MISO established," *id.*, is not a reason to overlook their ability to inject undue discrimination into the ERAS process.

Finally, FERC appeared to suggest that its statutory obligation to combat undue discrimination may yield as part of a balancing exercise that reflects the Federal Power Act's scheme of cooperative federalism. *Id.* P 68, JA___-__(R.121_47-48). But the statutory prohibition on undue discrimination is absolute and "an agency is not free simply to disregard statutory responsibilities" *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993), even if it believes doing so will further some other statutory goal, *El Paso Elec.*

43

*Co. v. FERC*, 76 F.4th 352, 361-62 (5th Cir. 2023) ("Neither of the statutory mandates served by the cost-causation principle can be sacrificed for the other or for some separate policy interest."). FERC balanced away its *statutory* responsibility, exactly as courts have prohibited.

### 3. The Orders Impermissibly Delegate FERC's Obligations Under the Federal Power Act to Retail Authorities.

The Retail Authority verification requirement is also illegal because it impermissibly delegates statutory authority to the Retail Authorities. An agency may not subdelegate its decision-making authority "to outside entities—private or sovereign—absent affirmative evidence of authority to do so." *U.S. Telecom Ass'n*, 359 F.3d at 566; *see also Entergy Servs., Inc.*, 120 FERC ¶ 61,020, at P 28 (2007) ("[R]atemaking obligations … cannot be delegated to a state commission."). FERC does not assert such authority. Nevertheless, FERC has done exactly that in allowing Retail Authorities to exercise an unreviewable preference regarding which resources—even among similarly situated resources—get access to ERAS.

FERC's two counters are unavailing. First, FERC insisted that, because the Retail Authorities' role is limited "to assessing and verifying

44

non-speculative interconnection requests that address an identified resource adequacy deficiency," ERAS "simply creates a role for [Retail Authorities] in a Commission-jurisdictional process." Order at P 101, JA____(R.108_51). But as explained, Retail Authority verification is *the* golden ticket necessary for a generator to access ERAS. Accordingly, FERC has not just created a role for Retail Authorities; it has given them control over which eligible generators can take advantage of the preference. Tellingly, FERC's Rehearing Order does not cite any precedent sanctioning a state's ability to pick-and-choose winners within a FERC jurisdictional process. *Cf. Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 165-66 (2016) (invalidating state regulatory program that "operate[d] within" a FERC-jurisdictional auction).

Second, FERC drew an inapposite analogy to state-determined rate elements that may be incorporated in Commission-jurisdictional proceedings. FERC explained that this sort of approach is permissible if it has reviewed the rate that incorporates the states' inputs and will continue to exercise oversight of the state's inputs via a complaint pursuant to section 206 of the Federal Power Act. Order at P 101, JA____(R.108_51). But FERC does not play any role in reviewing the

Retail Authority verification to ensure that similarly situated entities are not being treated differently. Instead, as explained above, the only oversight that FERC identifies is states' purported obligation to serve the public interest. Nor is there any ongoing role for a potential complaint under the Federal Power Act, since there is nothing in the tariff that cabins Retail Authority discretion and, thus, nothing to enforce. Because there is no opportunity for FERC to review Retail Authority discretion, the cases involving state-determined rate inputs are inapt.

## B. FERC Did Not Adequately Consider Arguments that ERAS Projects Received Financial Benefits at the Expense of End-Use Customers and Projects in the Standard Interconnection Process.

FERC failed to grapple with record evidence demonstrating that the ERAS projects receive financial benefits—at the expense of end-use customers and projects in the standard interconnection process. Public Interest Rehearing Request at 6, JA____(R.111_6). ERAS projects benefit from extreme, unsupported modeling assumptions that artificially decrease the network upgrades allocated to ERAS projects. Additionally, the unique nature of ERAS studies allows ERAS projects to avoid paying for upgrades that may be needed to address cumulative grid impacts. *Id.* at 7, JA____(R.111_7); Public Interest Initial Protest, Attach. A, Moaveni

Testimony at 7, JA___(R.91_100). FERC ignored this "important aspect of the problem," rendering its acceptance of ERAS arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43.

First, FERC failed to properly consider the significant advantages granted to ERAS projects in the form of the headroom that is modeled as available in their studies. In the standard interconnection process, MISO models the system headroom by assuming that all higher-queued generating facilities will enter operation. Public Interest Initial Protest, Attach. A, Moaveni Testimony at 6, 8, JA____(R.91_99), JA___(R.91_101). By contrast, for ERAS studies, MISO would only assume the presence of a *subset* of higher-queued generating facilities— those with executed interconnection agreements. Order at P 260, JA___-__(R.108_122-23). This approach arbitrarily inflates the headroom modeled as available for ERAS projects, decreasing their interconnection costs. Public Interest Initial Protest, Attach. A, Moaveni Testimony at 7, JA___(R.91_100).

FERC blithely asserted that excluding projects without executed agreements is justifiable because those projects are more likely to withdraw, creating uncertainty. Order at P 260, JA___-__(R.108_122-23);

47

Rehearing Order at P 82 JA___-__(R.121_58-60). Even assuming that is true, it does not justify MISO's non-realistic choice to model ERAS projects as if *all* projects without a finalized agreement will withdraw. FERC's approval of such an extreme modeling choice without justification is arbitrary and capricious.

Second, FERC ignored evidence demonstrating that ERAS projects are uniquely insulated from contributing towards upgrades required to accommodate clusters of contemporaneous interconnecting projects. As a result, FERC neglected to meaningfully consider this significant financial benefit, which comes at a cost to either generation projects in the standard interconnection process or end-use customers. Public Interest Rehearing Request at 7, JA___(R.111_7).

In the standard interconnection process, the cluster study identifies upgrades that are required both for individual facilities in the cluster and to address the cumulative impact of all projects in the cluster. Public Interest Initial Protest, Attach. A, Moaveni Testimony at 11, JA___(R.91_104). But ERAS projects are only studied individually; they will never be assigned the costs of a cluster upgrade. *Id.* at 9-10, JA___-__(R.91_102-03). This does not mean, however, that ERAS projects

do not contribute to the cumulative need for upgrades. Instead, cumulative needs to which ERAS projects contribute will be addressed by upgrades funded either by end-use electric customers or projects in the standard interconnection process. Public Interest Initial Protest, Attach. A, Moaveni Testimony at 9-10, JA___-__(R.91_102-03). Indeed, MISO stated clearly that end-use customers will pay for any upgrades needed to address the cumulative interconnection of ERAS and standard-process projects. MISO Filing, Witmeier Testimony at 55:3-7, JA___(R.1_968).

Additionally, because the study MISO conducts to capture such needs uses less sensitive analysis than interconnection studies, some upgrade needs might still go unaddressed until the next standard interconnection process. Clean Grid Alliance Rehearing Request at 8-10, JA___-__(R.112_8-10). In that case, the costs of those cumulative upgrades would be paid for by projects in the standard interconnection process. *Id.*

FERC failed to engage with these points substantively, let alone evaluate these outsized benefits in evaluating ERAS. In the Order, FERC offered the conclusory response that "MISO explains that its proposed

49

ERAS study will identify network upgrades and other facilities necessary for the interconnection of ERAS interconnection customers," and "therefore disagree[d]" that ERAS projects would avoid potential network upgrades. Order at P 262, JA___-__(R.108_123-24). This statement does not reference any particular explanation from MISO, let alone meaningfully contend with Petitioners' specific concerns.

On rehearing, FERC offered further statements but still avoided engaging with the specifics. First, FERC deemed Petitioners' concerns "speculative" without addressing their merits. Rehearing Order at P 86, JA___-__(R.121_62-63). FERC itself then speculated, without evidence, that a future project in the standard interconnection process could benefit from an ERAS project's upgrades. *Id.* But FERC's speculation distracts from the fact that ERAS projects receive the unique benefit of *never* contributing towards cumulative impacts. FERC then stated that any differential financial benefits that ERAS projects *do* enjoy are justified because ERAS projects and standard interconnection process projects are not similarly situated. *Id.* P 80, JA___(R.121_57). But as described above, nothing about ERAS ensures that this discrimination is due. Thus, this late defense also falls flat.

## II.   FERC Erred in Concluding that ERAS is Narrowly Tailored.

In keeping with its obligation to preserve open access and its critical role in containing rates, FERC has rarely approved expedited interconnection processes, and only when they are "narrowly tailored." Initial ERAS Order, 191 FERC ¶ 61,131, at P 202. Indeed, FERC rejected MISO's initial ERAS proposal because it was not narrowly tailored. On review of the revised proposal, however, FERC changed its result, without properly explaining how it determined that ERAS's deviations from the standard open access rules were narrowly tailored. *See City & Cnty. of San Francisco v. FERC*, 24 F.4th 652, 658 (D.C. Cir. 2022) (passing reference to factors considered without more examined details of each factor weighed is not reasoned decision-making).

Further, FERC's conclusory statements that various parts of the revised ERAS design were appropriately limited do not comport with the record. Order at PP 89, 195, 203, 211, 212, 265, JA___(R.108_43-44), JA___-__(R.108_92-93), JA___-__(R.108_96-97), JA___-__(R.108_101-02), JA___(R.108_102), JA___-__(R.108_124-25); Rehearing Order at PP 15, 23, 29, 55-65, JA___-__(R.121_9-10), JA___-__(R.121_15-16), JA___-__(R.121_18-19), JA___-__(R.121_38-44). First, FERC's approval of a 68-

project cap is unsupported by record evidence connecting it to a resource adequacy need and fails to reckon with the harms associated with excessive ERAS projects. Second, ERAS's design fails to ensure that the chosen resources will come into service in time to meet the stated resource needs, undermining the entire purpose of the program. As a result, the Orders are arbitrary and capricious.

## A.    FERC Failed to Support Its Approval of a System-Wide ERAS Cap that Fails to Limit Unneeded Projects.

FERC failed to adequately explain why MISO's proposed cap on the number of projects that can participate in ERAS is narrowly tailored to ensure that ERAS does not admit more projects than necessary to address MISO's claimed resource adequacy needs. When FERC rejected the first ERAS proposal, it instructed MISO to design a program size cap that would limit ERAS to projects that were truly needed, ensuring that the program was narrowly tailored. Initial ERAS Order, 191 FERC ¶ 61,131, at P 199. Despite that instruction, FERC never explained how the cap in MISO's revised proposal—even in tandem with other ERAS changes—met that standard, nor how MISO arrived at this particular number. FERC's failure to explain its decisionmaking renders

52

the underlying Orders arbitrary and capricious. *See, e.g., Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006).

## 1. FERC Did Not Provide a Reasoned Explanation for the 68-Project Cap and Arbitrarily Approved a Cap Not Tethered to Need.

FERC failed to explain why it was reasonable for MISO to set the cap at 68 projects. While FERC offered vague platitudes for the use of a cap *as a general matter*, it never explained why 68 projects was a reasonable limitation. *See generally* Order at P 203, JA___-__(R.108_96-97). The closest FERC came to addressing MISO's specific proposal was to repeat MISO's rationale that 68 projects was the number that "MISO determined it can efficiently study in the short-term" and was "consistent with" what FERC approved for PJM's expedited interconnection process. *Id.* (citing MISO Answer at 13).

But FERC did not explain why it was reasonable for MISO to benchmark its cap against the 50-project cap in PJM, a region with starkly different needs. In light of the material differences between the regions, which protesters pointed out, Public Interest Protest at 19, JA___(R.91_21) (noting, among other statistics, that PJM has a peak demand 25% greater than MISO's), FERC needed to explain why it was

relevant that MISO's proposed cap was consistent with what the Commission approved for PJM. On that score, it failed.

Relatedly, FERC fell short when explaining why the 68-project cap was adequately tailored to address MISO's stated needs. In the Initial ERAS Order, FERC found that the lack of a cap threatened "a volume of ERAS interconnection requests untethered to reliability or resource adequacy needs." Initial ERAS Order, 191 FERC ¶ 61,131, at P 199. In other words, FERC identified a cap as necessary for tailoring ERAS to MISO's stated need. *See id.* P 201 (finding that MISO failed to prove that ERAS was "sufficiently targeted to study *only* interconnection requests needed to meet the anticipated shortfall." (emphasis added)).

The second time around, FERC was required to explain why MISO's proposed cap was set at a level to ensure that MISO would study only those projects needed to meet the resource shortfall. Instead, FERC insisted that Public Interest Petitioners ignored "numerous other design elements … that also reasonably limit participation under the Revised ERAS Proposal." Rehearing Order at P 61, JA____(R.121_41). FERC, however, never acknowledged it was changing course regarding its

insistence on a cap tailored to MISO's needs, as it was required to do. *Fox Television Stations, Inc.*, 556 U.S. at 515-16.

Further, the other elements FERC claimed limited ERAS, particularly the Retail Authority verification and the tariff requirement that each individual ERAS project is limited to requesting interconnection service that no more than 150% of an individually identified megawatt need, Rehearing Order at P 61, JA____(R.121_41), are inadequate to ensure that MISO studies only interconnection requests needed to meet the anticipated shortfall. First, the Initial ERAS proposal already featured a requirement that was materially similar to the verification requirement, and yet FERC found that proposal insufficiently tailored without a cap. Initial ERAS Order, 191 FERC ¶ 61,131, at P 199. By FERC's own reasoning, the (also flawed) Retail Authority verification requirement itself does not adequately limit ERAS. Second, the 150% interconnection service limit on individual projects does nothing to ensure that ERAS is adequately tailored to address needs across the MISO system, which is the stated purpose of ERAS. *See* ERAS Filing at 15-16, JA___-__(R.1_15-16) (summarizing *MISO-wide* gaps in the Organization of MISO States-MISO Survey and

the aggregate peak demand gaps in the North American Electric Reliability Corporation Long-Term Reliability Assessment).[6] Assuming *arguendo* that 68 projects could be the right number to address MISO's resource adequacy need, if each project elects to build at 150% of the resource adequacy need, ERAS would procure 50% more capacity than the identified need. A solution with a 50% margin of error is not narrowly tailored. Simply put, FERC failed to establish how the individual capacity limitation is an adequate substitute for ensuring the ERAS *writ large* is narrowly tailored. Only the 68-project cap limits the total size of ERAS.

## 2. FERC's "Balancing" Failed to Consider Costs Caused by ERAS Projects, or to Properly Explain the Factors It Did Consider.

FERC's final rationale for accepting the cap—that it "strikes a reasonable balance between ensuring broader participation and addressing the resource adequacy needs of the region, while providing reasonable limitations on the number of interconnection requests that

---

[6] FERC conflates megawatts of interconnection service (which is based on the maximum output a generator can produce) with megawatts of accredited capacity (which is a more complex metric that measures the resource adequacy value of a given resource type).

will be studied through the ERAS process," does not give even the slightest indication of how FERC reached its ultimate conclusion. Order at P 203, JA___-__(R.108_96-97). Although an agency is surely permitted to balance multiple considerations in reaching a policy determination, it is not enough to simply assert that it engaged in such balancing without any indication or evidence as to how it reached its conclusion. *See City & Cnty. of San Francisco*, 24 F.4th at 658.

Moreover, FERC ignored concerns that should have factored into such balancing, including concerns that by allowing more projects than necessary to enter ERAS, MISO's proposal increases the costs of ERAS to consumers. Public Interest Protest at 16-17, JA___-__(R.111_18-19). As MISO's expert explained to FERC, MISO studies projects in both ERAS and the standard interconnection process as if they both have equal access to any available grid space—in essence, double-allocating this transmission capacity. Witmeier Testimony at 55:11-13, JA___(R.1_968). But in practice, multiple projects cannot share grid space. Instead, MISO identifies any upgrades caused by this double-allocation in a subsequent transmission expansion process, in which customers generally pay for these upgrades. *Id.* at 55:16-18.

57

JA___(R.1_968). The more projects individually studied in ERAS, the more potential double-allocations of headroom that would need to be resolved by customer-funded upgrades.

FERC's only response to these concerns was that it has approved the transmission expansion process as just and reasonable for use in other contexts. Order at P 264, JA____(R.108_124). But finding a process just and reasonable in some contexts does not mean it is just and reasonable in all contexts, *see Emera Maine v. FERC*, 854 F.3d 9, 23 (D.C. Cir. 2017) ("[W]hether a rate … is unlawful depends on the particular circumstances of the case."), and is irrelevant to Public Interest Petitioners' broader concern that FERC's "balancing" failed to consider key factors as to whether the 68-project cap was appropriately narrowly tailored.

## B. FERC Erroneously Dismissed Arguments That ERAS Is Open to Resources that Will Not Come Online in the Near-Term.

The Orders are arbitrary and capricious and not based on reasoned decision-making for a further reason: they approve a new interconnection process that, by its own terms, is not structured to meet its goal of filling an urgent resource need. Faced with a problem that MISO stated will

58

accrue within the next five years, FERC approved a purported solution that will take up to eight years. That decision violates the APA. Indeed, this Court has already held that it "cannot overlook such unexplained inconsistency" when FERC approves a policy extending past a "limited period of time" of identified need. *Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 186 (D.C. Cir. 2022).

FERC relied on MISO's assertions of a "4.7 gigawatt [] shortfall by 2028" under the status quo and credits ERAS's intent to "address urgent resource adequacy and reliability needs in the near term (i.e., within the next five years)." Order at P 14, JA___-___(R.108_6-7); *see also id.* PP 33, 82, JA___-__ (R.108_15-16), JA__ -__(R.108_40-41). Despite this finding, FERC acknowledged that ERAS projects have six years from the date of their interconnection request to enter commercial operation, and that ERAS projects requesting interconnection in 2027 would therefore be allowed to delay operation until 2033. *Id.* P 84, JA___(R.108_42). FERC dismissed this possibility as an unlikely "worst-case scenario," counting on the program's purported screening for "shovel-ready projects" to increase the likelihood of projects timely achieving commercial operation. *Id.* FERC's concept of "shovel-read[iness]" is flawed, as discussed *infra*

§ II.B.2—but even assuming *arguendo* that FERC's notion of shovel-readiness were valid, ERAS would still accept projects that may not operate until 2033, years past the articulated need. Adopting a 2033 solution to a 2028-2031 problem is "illogical on its own terms," rendering the Orders arbitrary and capricious. *Am. Fed. Gov't Emps., Local 2924 v. FLRA*, 470 F.3d 375, 380 (D.C. Cir. 2006) (quoting *IRS v. FLRA*, 963 F.2d 429, 439 (D.C. Cir. 1992)).

### 1. FERC Failed to Ensure That ERAS Screens for Projects Ready to Commence—and Complete—Construction.

Despite finding that ERAS was designed for "'shovel ready' projects that meet specific, near-term resource adequacy needs," Order at P 210, JA\_\_\_(R.108_101), the Commission never explained how ERAS identifies those projects that can expeditiously "commence construction," which was how FERC defined "shovel-ready," *id.* P 36, JA\_\_\_-\_\_(R.108_17-19). Even looking past this failing, the version of shovel-readiness that the Commission actually adopted does not ensure that projects are selected that will enter service in time to solve the identified resource adequacy need.

FERC missed the forest for the trees in examining several details of MISO's proposal. FERC suggested that the "ERAS eligibility

requirements designed to swiftly identify 'shovel ready' projects" include the commercial operating deadline; Retail Authority verification; an executed offtake agreement; a non-refundable application fee, a milestone payment, cost responsibility for network upgrades, 100% Site Control, and a requirement for Network Resource Interconnection Service. Order at P 210, JA___(R.108_101). And FERC indicated that these elements are "deterrents against speculative projects." *Id.* However, criteria meant to root out "speculative" projects are not the same as criteria designed to identify "shovel-ready" projects, much less those projects able to fully come online in the near-term. *Id.*

Further, the Orders erroneously focused on criteria that shed light on the likelihood for success in the early and intermediate stages of project development, but not the crucial final stages. Though FERC credited ERAS's ability to "swiftly identify" suitable projects and to "accelerate the study" of such projects as positioning the program to meet asserted near-term needs, *id.* P 84, JA___(R.108_42), neither of those procedural elements can overcome delays from labor and supply chain shortages, including raw materials and electrical equipment, which can delay generation projects past their anticipated operation date. *Id.* P 54,

JA\_\_\_(R.108\_27) (citing, *inter alia*, Clean Grid Alliance Protest at 2, JA\_\_\_(R.85\_2)).

### 2. FERC Unlawfully Departed from Its Recent Decision Emphasizing Ability to Timely Complete Construction.

While FERC has previously required more as indicia of "shovel-readiness," here it unlawfully departs from that precedent without acknowledging or explaining its change of course, as it was required to do. *See Fox Television Stations, Inc.*, 556 U.S. at 515. Specifically, in accepting PJM's first fast-track interconnection proposal, FERC credited the scheme's readiness criteria, including those that would award points to projects with "financing, permits, a fully executed engineering, procurement, and construction agreement, and acquisition of major equipment, all of which are necessary to meet a near-term commercial operation date." *PJM Interconnection, L.L.C.*, 190 FERC ¶ 61,084 at P 155. Two concurring Commissioners credited these criteria as ensuring that selected projects will be "shovel ready." *Id.* (Rosner & Phillips, Comm'rs, concurring at P 11).

Yet five months later, FERC accepted MISO's ERAS proposal even though it would not assess whether prospective generation projects have secured the agreements and equipment "*necessary* to meet a near-term

62

commercial operation date." *PJM Interconnection, L.L.C.*, 190 FERC ¶ 61,084 at P 155 (emphasis added). On rehearing, FERC contended that the PJM order "did not establish any 'sink steel into the ground' rule" and that its evaluation of MISO's proposal was "consistent with how [FERC] reviewed [PJM's Reliability Resource Initiative] proposal." Rehearing Order at PP 50, 51, JA___(R.121_34-35), JA__(R.121_35). But FERC never explained why the criteria it had said were "necessary" to ensure construction can commence in PJM were no longer "necessary" for MISO.

### 3. FERC Failed to Consider Evidence that the Standard Interconnection Process Can Timely Fill the Identified Need.

FERC's comparisons to the standard interconnection process were arbitrary and capricious as well. In accepting ERAS, FERC found that the projected completion timeline for ERAS was superior to that of projects in the standard interconnection process. *See* Order at P 84, JA___(R.108_42) (favorably comparing ERAS's commercial operation requirement to "the maximum 11-year commercial operation deadline that is used by some [standard] interconnection requests"). And FERC concluded that the newly sped-up standard interconnection process will

be "unlikely to be sufficient to meet MISO's near-term resource adequacy needs." Order at P 83, JA___-__(R.108_41-42).

In reaching these conclusions, FERC ignored evidence in the record regarding critical improvements to the standard interconnection process. Public Interest Petitioners showed that the historical processing rate does not reflect reforms implemented in 2022, *see Midcontinent Indep. Sys. Operator, Inc.*, 178 FERC ¶ 61,141, nor recent software improvements. Public Interest Protest at 30-31, JA___-__(R.91_32-33). Indeed, projects in the previous three cycles of MISO's standard interconnection process are expected to reach signed interconnection agreements in 2026. *Id.*

Other evidence showed that many late-stage standard interconnection process requests "may have an expected operational date[ ] prior to those of brand-new ERAS projects." Associations Rehearing Request at 12, JA___(R.112_12). It was arbitrary and capricious for the Commission to ignore this evidence and assume that the pre-reform performance of the standard interconnection process would continue. *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (reasoned decision making requires an agency to "reasonably

reflect upon the information contained in the record and grapple with contrary evidence").

On rehearing, FERC mischaracterized record evidence to conclude that standard interconnection process projects could not fill MISO's articulated resource adequacy need. FERC stated that, "[i]n assessing resource adequacy needs and reliability risks in MISO, the evidence discussed above—including the 2025 Organization of MISO States-MISO Survey—considered how much new capacity was likely to become available in the near term." Rehearing Order at P 38, JA____(R.121_25-27). But these sources did not consider the likelihood of resources coming online at different levels in the near-term, much less examine how interconnection queue improvements will alter outcomes going forward. *See* Public Interest Protest at 30-31, JA____-__(R.91_32-33). FERC's reliance on the Organization of MISO States-MISO survey is reversible error because FERC "must be able to demonstrate that it has 'made a reasoned decision based upon substantial evidence in the record.'" *N. States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994) (citation omitted).

## III. REMEDY

### A. The Court Should Vacate FERC's Orders Accepting ERAS.

Because FERC's Orders are unlawful, this Court should vacate them. *See Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) ("Vacatur is the normal remedy under the APA.").[7]

### B. The Court Should Vacate FERC's Orders but Leave FERC Free to Consider Equitable Resolution of Its Errors.

Numerous parties, including members of the Associations, have taken actions to develop new generators to address reliability concerns in reliance on the currently effective tariff language. Given those actions, this Court should clarify that ordering vacatur will not immediately disrupt MISO's generator interconnection process or actions taken in reliance on the rules in effect at the time, including ERAS.

---

[7] Petitioners Natural Resources Defense Council, Clean Wisconsin, and Sierra Club join Associations in requesting vacatur with remand but only join insofar as the Court should vacate and remand based on long-standing D.C. Circuit precedent. *See also Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1322 (D.C. Cir. 2004) ("[T]he petitions are granted, and the orders are vacated and remanded to FERC for further consideration."); *Associated Gas Distribs. v. FERC*, 893 F.2d 349, 359 (D.C. Cir. 1989) ("[W]e vacate the orders on this point and remand to [FERC]."). In the absence of any party requesting disturbance of agreements entered pursuant to the rate on file, these Petitioners do not believe the court needs to reach whether such a remedy is available as a consequence of vacatur.

The Court need not opine on what FERC's new rate ought to be, as those questions are for FERC in the first instance. After all, FERC bears the "statutory responsibility to ensure that all rates" are just and reasonable and not unduly discriminatory or preferential. *Cogentrix Energy Power Mgmt., LLC v. FERC*, 24 F.4th 677, 683-84 (D.C. Cir. 2022) (citing *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951)). And FERC also has "ample" equitable "authority to remedy its own errors after being reversed in court," *La. Pub. Serv. Comm'n v. FERC*, 866 F.3d 426, 431 (D.C. Cir. 2017), and can tailor an appropriate response that reflects reliance interests and ensures electric reliability. *XO Energy MA, LP v. FERC*, 77 F.4th 710, 716 (D.C. Cir. 2023) ("In fashioning remedies, the Commission's discretion is at its zenith.") (cleaned up); *Nat. Gas Clearinghouse v. FERC*, 965 F.2d 1066, 1074 (D.C. Cir. 1992) (FERC has "discretionary authority to correct errors resulting from orders overturned by a reviewing court"). As such, any vacatur should expressly leave these issues for FERC on remand.

As caselaw from analogous contexts illustrates, this Court likewise need not opine on the lawfulness of studies and agreements entered into under ERAS. *See Burlington N., Inc. v. United States*, 459 U.S. 131

(1982). *Burlington Northern* prohibits courts from directly revising rates when vacating agency orders. As *Burlington Northern* recognized, "Congress [often] channel[s] all rate decisions to the [relevant] Commission in the first instance," so that the authority to set rates resides with the agency. *Burlington N., Inc.*, 459 U.S. at 140.

To respect that "allocation of authority," where a jurisdictional provision says that the court may "make a judgment determining the validity of, and enjoining … the *order* of the agency," the court's authority "authority to reject Commission rate orders for whatever reason extends to the orders alone, and not to the rates themselves." *Id.* at 133, 141 (quoting 28 U.S.C. § 2349). When the order is vacated, it then falls to the agency to implement a new rate. FERC has followed this precedent previously. *See ISO New England Inc. v. Bangor Hydro-Elec. Co.*, 161 FERC ¶ 61,031, at P 27 & n.58 (2017).

This Court may (and should) hold that the Orders are unlawful, and it may (and should) explain why. But because this Court's "authority to reject [FERC's Order] for whatever reason extends to the order[] alone, and not to the rates themselves," *Burlington Northern*, 459 U.S. at 141, this Court may not establish a new tariff on file.

## C. In the Alternative, the Court Should Remand Without Vacatur

Alternatively, if there is any doubt as to whether vacatur is appropriate, the Court should remand the Orders to FERC without vacatur. In deciding whether to vacate agency action, the Court balances two considerations: (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the disruptive consequences" of vacatur. *City of Port Isabel v. FERC*, 130 F.4th 1034, 1036 (D.C. Cir. 2025) (quoting *Allied-Signal v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993)). "[A] quintessential disruptive consequence arises" when a remedy "would require 'unravel[ing]' and 'disrupt[ing] settled transactions.'" *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 132 F.4th 535, 542 (D.C. Cir. 2025) (quoting *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020)). And, as the *en banc* Court has recently recognized, vacating orders that lay the foundation for the development of energy infrastructure may have especially "significant disruptive consequences," including with respect to contractual commitments, financing, and labor and construction contracts. *City of Port Isabel*, 130 F.4th at 1038. As explained above, Petitioners believe vacatur should not affect actions

69

taken in reliance on ERAS—but if that were incorrect, then vacating FERC's order could have similarly "significant disruptive consequences." While FERC's ERAS order did not, itself, approve any particular generator's interconnection, MISO has been administering the ERAS process since September 2025. MISO has already completed two ERAS cycles, with a third underway. Indeed, MISO has already entered into a number of generator interconnection agreements as a result of the ERAS process. *See, e.g.,* Filing, Docket No. ER26-1988-000 (filed Mar. 31, 2026).

Many "transactions" have thus already been "settled" on the basis of the order. Corrections are needed to how ERAS slots are allocated going forward, but Petitioners recognize that it would be foolish to attempt to "undo" the studies and corresponding agreements that were entered into in reliance on the existing Orders. Given the scale of the existing projects, "[c]asting doubt on [them] would be an 'invitation to chaos.'" *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 853 F. Supp. 2d 138, 144 (D.D.C. 2012), *aff'd*, 751 F.3d 629 (D.C. Cir. 2014).

## CONCLUSION

This Court should vacate the challenged Orders; alternatively, this Court should remand without vacatur.

70

Respectfully submitted,

*/s/ Nicholas M. Gladd*

ADA STATLER
SAMEER DOSHI
AARON STEMPLEWICZ
*Earthjustice*
*180 Steuart St. #194330*
*San Francisco, CA 94105*
*(415) 217-2091*
*astatler@earthjustice.org*

*Counsel for Clean Wisconsin*
*and Natural Resources*
*Defense Council*

MELISSA ALFANO
*Solar Energy Industries*
*Association*
*1425 K St. NW, Suite 100*
*Washington, DC 20005*
*(703) 589-5446*
*malfano@seia.org*

*Counsel for Solar Energy*
*Industries Association*

CAROLINE REISER
*Natural Resources Defense*
*Council*
*1152 15th St. NW, Suite 300*
*Washington, DC 20005*
*(202) 717-8341*
*creiser@nrdc.org*

*Counsel for Natural Resources*
*Defense Council*

NICHOLAS M. GLADD
MATT CHRISTIANSEN
JOHN B. KENNEY
BRYAN SHPALL
RACHEL NEUBURGER
*Wilson Sonsini Goodrich & Rosati, P.C.*
*1700 K. St. N.W.*
*Washington, DC 20006*
*(781) 719-8255*
*ngladd@wsgr.com*

*Counsel for Advanced Energy*
*United, American Clean Power*
*Association, Clean Grid Alliance, and*
*Solar Energy Industries Association*

GREGORY E. WANNIER
*Sierra Club*
*2101 Webster St., Suite 1300*
*Oakland, CA 94612*
*(415) 977-5646*
*greg.wannier@sierraclub.org*

JONAH BASKIN
*Sierra Club*
*50 F St. NW, 8th Floor*
*Washington, DC 20001*
*(202) 556-3917*
*jonah.baskin@sierraclub.org*

*Counsel for Sierra Club*

71

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Century School Book 14-point font.

Respectfully submitted,

Dated: April 17, 2026

/s/ *Nicholas M. Gladd*
Nicholas M. Gladd
*Counsel for Petitioners Advanced Energy United, American Clean Power Association, Clean Grid Alliance, and Solar Energy Industries Association*

## CERTIFICATE OF SERVICE

I certify that, on April 17, 2026, I caused this document to be filed electronically with the Clerk of Court using the CM/ECF system, and thereby served via CM/ECF on all parties and counsel of record.

Dated: April 17, 2026

/s/ *Nicholas M. Gladd*
Nicholas M. Gladd
*Counsel for Petitioners Advanced Energy United, American Clean Power Association, Clean Grid Alliance, and Solar Energy Industries Association*

73

NOT YET SCHEDULED FOR ORAL ARGUMENT
No. 25-1264 (Consolidated with 25-1266)

# In the United States Court of Appeals for the District of Columbia Circuit

————————

CLEAN WISCONSIN, ET AL.,
PETITIONERS

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

————————

*ON PETITION FOR REVIEW OF FINAL ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION*

————————

## ADDENDUM TO OPENING BRIEF OF PETITIONERS

————————

NICHOLAS M. GLADD
MATT CHRISTIANSEN
JOHN B. KENNEY
BRYAN SHPALL
RACHEL NEUBURGER
*Wilson Sonsini Goodrich & Rosati, P.C.*
*1700 K. St. N.W.*
*Washington, DC 20006*
*(781) 719-8255*
*ngladd@wsgr.com*

*Counsel for Advanced Energy
United, American Clean Power
Association, Clean Grid Alliance, and
Solar Energy Industries Association*

ADA STATLER
SAMEER DOSHI
AARON STEMPLEWICZ
*Earthjustice*
*180 Steuart St. #194330*
*San Francisco, CA 94105*
*(415) 217-2091*
*astatler@earthjustice.org*

*Counsel for Clean Wisconsin
and Natural Resources
Defense Council*

MELISSA ALFANO
*Solar Energy Industries Association*
*1425 K St. NW, Suite 100*
*Washington, DC 20005*
*(703) 589-5446*
*malfano@seia.org*

*Counsel for Solar Energy*
*Industries Association*

CAROLINE REISER
*Natural Resources Defense Council*
*1152 15th St. NW, Suite 300*
*Washington, DC 20005*
*(202) 717-8341*
*creiser@nrdc.org*

*Counsel for Natural Resources*
*Defense Council*

GREGORY E. WANNIER
*Sierra Club*
*2101 Webster St., Suite 1300*
*Oakland, CA 94612*
*(415) 977-5646*
*greg.wannier@sierraclub.org*

JONAH BASKIN
*Sierra Club*
*50 F St. NW, 8th Floor*
*Washington, DC 20001*
*(202) 556-3917*
*jonah.baskin@sierraclub.org*

*Counsel for Sierra Club*

APRIL 17, 2026

# ADDENDUM TABLE OF CONTENTS

**Statutes**

5 U.S.C. § 706 ...............................................................ADD-001

16 U.S.C. § 824 ............................................................ADD-002

16 U.S.C. § 824d ..........................................................ADD-005

16 U.S.C. § 824e ..........................................................ADD-007

16 U.S.C. § 824*l* ..........................................................ADD-010

**Standing Declarations**

*Clean Wisconsin*

   Declaration of Rick Coelho........................................................ADD-013

*EDP Renewables North America LLC*

   Declaration of David Mindham................................................ADD-019

*Natural Resources Defense Council*

   Declaration of Patricia Marie Godwin.....................................ADD-024

   Declaration of Loretta Lemkuil ...............................................ADD-028

*Sierra Club*

   Declaration of David Rogers ...................................................ADD-032

   Declaration of William Schroeer..............................................ADD-035

   Declaration of Belinda Thielen ...............................................ADD-038

§ 705    TITLE 5—GOVERNMENT ORGANIZATION AND EMPLOYEES    Page 230

vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

#### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

| Sec. | |
|---|---|
| 801. | Congressional review. |
| 802. | Congressional disapproval procedure. |
| 803. | Special rule on statutory, regulatory, and judicial deadlines. |
| 804. | Definitions. |
| 805. | Judicial review. |
| 806. | Applicability; severability. |
| 807. | Exemption for monetary policy. |
| 808. | Effective date of certain rules. |

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(D) For any rule submitted under subparagraph (A), if the Federal agency promulgating

**(g) Qualifying criteria for closed-loop pumped storage projects**

**(1) In general**

The Commission shall establish criteria that a pumped storage project shall meet in order to qualify as a closed-loop pumped storage project eligible for the expedited process established under this section.

**(2) Inclusions**

In establishing the criteria under paragraph (1), the Commission shall include criteria requiring that the pumped storage project—

(A) cause little to no change to existing surface and ground water flows and uses; and

(B) is unlikely to adversely affect species listed as a threatened species or endangered species under the Endangered Species Act of 1973 [16 U.S.C. 1531 et seq.].

**(h) Savings clause**

Nothing in this section affects any authority of the Commission to license a closed-loop pumped storage project under this subchapter.

(June 10, 1920, ch. 285, pt. I, §35, as added Pub. L. 115–270, title III, §3004, Oct. 23, 2018, 132 Stat. 3865.)

#### Editorial Notes

##### References in Text

The Fish and Wildlife Coordination Act, referred to in subsec. (c)(2), (3)(A), is act Mar. 10, 1934, ch. 55, 48 Stat. 401, which is classified generally to sections 661 to 666c–1 of this title. For complete classification of this Act to the Code, see section 661(a) of this title, Short Title note set out under section 661 of this title, and Tables.

The National Environmental Policy Act of 1969, referred to in subsec. (e), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The Endangered Species Act of 1973, referred to in subsec. (g)(2)(B), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified principally to chapter 35 (§1531 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of this title and Tables.

**§ 823g. Considerations for relicensing terms**

**(a) In general**

In determining the term of a new license issued when an existing license under this subchapter expires, the Commission shall take into consideration, among other things—

(1) project-related investments by the licensee under the new license; and

(2) project-related investments by the licensee over the term of the existing license.

**(b) Equal weight**

The determination of the Commission under subsection (a) shall give equal weight to—

(1) investments by the licensee to implement the new license under this subchapter, including investments relating to redevelopment, new construction, new capacity, efficiency, modernization, rehabilitation or replacement of major equipment, safety improvements, or environmental, recreation, or other protection, mitigation, or enhancement measures required or authorized by the new license; and

(2) investments by the licensee over the term of the existing license (including any terms under annual licenses) that—

(A) resulted in redevelopment, new construction, new capacity, efficiency, modernization, rehabilitation or replacement of major equipment, safety improvements, or environmental, recreation, or other protection, mitigation, or enhancement measures conducted over the term of the existing license; and

(B) were not expressly considered by the Commission as contributing to the length of the existing license term in any order establishing or extending the existing license term.

**(c) Commission determination**

At the request of the licensee, the Commission shall make a determination as to whether any planned, ongoing, or completed investment meets the criteria under subsection (b)(2). Any determination under this subsection shall be issued within 60 days following receipt of the licensee's request. When issuing its determination under this subsection, the Commission shall not assess the incremental number of years that the investment may add to the new license term. All such assessment shall occur only as provided in subsection (a).

(June 10, 1920, ch. 285, pt. I, §36, as added Pub. L. 115–270, title III, §3005, Oct. 23, 2018, 132 Stat. 3867.)

## SUBCHAPTER II—REGULATION OF ELECTRIC UTILITY COMPANIES ENGAGED IN INTERSTATE COMMERCE

**§ 824. Declaration of policy; application of subchapter**

**(a) Federal regulation of transmission and sale of electric energy**

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**(b) Use or sale of electric energy in interstate commerce**

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted

across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

**(c) Electric energy in interstate commerce**

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

**(d) "Sale of electric energy at wholesale" defined**

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

**(e) "Public utility" defined**

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),[1] 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing act-

ing as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g) Books and records**

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

(June 10, 1920, ch. 285, pt. II, §201, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 847; amended Pub. L. 95–617, title II, §204(b), Nov. 9, 1978, 92 Stat. 3140; Pub. L. 102–486, title VII, §714, Oct. 24, 1992, 106 Stat. 2911; Pub. L. 109–58, title XII, §§1277(b)(1), 1291(c), 1295(a), Aug. 8, 2005, 119 Stat. 978, 985; Pub. L. 114–94, div. F, §61003(b), Dec. 4, 2015, 129 Stat. 1778.)

### Editorial Notes

#### REFERENCES IN TEXT

The Rural Electrification Act of 1936, referred to in subsec. (f), is act May 20, 1936, ch. 432, 49 Stat. 1363, which is classified generally to chapter 31 (§901 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 901 of Title 7 and Tables.

The Public Utility Holding Company Act of 2005, referred to in subsec. (g)(5), is subtitle F of title XII of Pub. L. 109–58, Aug. 8, 2005, 119 Stat. 972, which is classified principally to part D (§16451 et seq.) of subchapter XII of chapter 149 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 15801 of Title 42 and Tables.

---

[1] So in original. Section 824e of this title does not contain a subsec. (f).

AMENDMENTS

2015—Subsec. (b)(2). Pub. L. 114–94, §61003(b)(1), inserted ''824o–1,'' after ''824o,'' in two places.

Subsec. (e). Pub. L. 114–94, §61003(b)(2), inserted ''824o–1,'' after ''824o,''.

2005—Subsec. (b)(2). Pub. L. 109–58, §1295(a)(1), substituted ''Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title'' for ''The provisions of sections 824i, 824j, and 824k of this title'' and ''Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title'' for ''Compliance with any order of the Commission under the provisions of section 824i or 824j of this title''.

Subsec. (e). Pub. L. 109–58, §1295(a)(2), substituted ''section 824e(e), 824e(f), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title'' for ''section 824i, 824j, or 824k of this title''.

Subsec. (f). Pub. L. 109–58, §1291(c), which directed amendment of subsec. (f) by substituting ''political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year,'' for ''political subdivision of a state,'', was executed by making the substitution for ''political subdivision of a State,'' to reflect the probable intent of Congress.

Subsec. (g)(5). Pub. L. 109–58, §1277(b)(1), substituted ''2005'' for ''1935''.

1992—Subsec. (g). Pub. L. 102–486 added subsec. (g).

1978—Subsec. (b). Pub. L. 95–617, §204(b)(1), designated existing provisions as par. (1), inserted ''except as provided in paragraph (2)'' after ''in interstate commerce, but'', and added par. (2).

Subsec. (e). Pub. L. 95–617, §204(b)(2), inserted ''(other than facilities subject to such jurisdiction solely by reason of section 824i, 824j, or 824k of this title)'' after ''under this subchapter''.

#### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by section 1277(b)(1) of Pub. L. 109–58 effective 6 months after Aug. 8, 2005, with provisions relating to effect of compliance with certain regulations approved and made effective prior to such date, see section 1274 of Pub. L. 109–58, set out as an Effective Date note under section 16451 of Title 42, The Public Health and Welfare.

STATE AUTHORITIES; CONSTRUCTION

Nothing in amendment by Pub. L. 102–486 to be construed as affecting or intending to affect, or in any way to interfere with, authority of any State or local government relating to environmental protection or siting of facilities, see section 731 of Pub. L. 102–486, set out as a note under section 796 of this title.

PRIOR ACTIONS; EFFECT ON OTHER AUTHORITIES

Pub. L. 95–617, title II, §214, Nov. 9, 1978, 92 Stat. 3149, provided that:

''(a) PRIOR ACTIONS.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall apply to, or affect, any action taken by the Commission [Federal Energy Regulatory Commission] before the date of the enactment of this Act [Nov. 9, 1978].

''(b) OTHER AUTHORITIES.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall

limit, impair or otherwise affect any authority of the Commission or any other agency or instrumentality of the United States under any other provision of law except as specifically provided in this title.''

### § 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

#### (a) Regional districts; establishment; notice to State commissions

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

#### (b) Sale or exchange of energy; establishing physical connections

Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

#### (c) Temporary connection and exchange of facilities during emergency

(1) During the continuance of any war in which the United States is engaged, or whenever

mental orders in the premises as it may find necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any security so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of subsection (a) of this section.

#### (c) Compliance with order of Commission

No public utility shall, without the consent of the Commission, apply any security or any proceeds thereof to any purpose not specified in the Commission's order, or supplemental order, or to any purpose in excess of the amount allowed for such purpose in such order, or otherwise in contravention of such order.

#### (d) Authorization of capitalization not to exceed amount paid

The Commission shall not authorize the capitalization of the right to be a corporation or of any franchise, permit, or contract for consolidation, merger, or lease in excess of the amount (exclusive of any tax or annual charge) actually paid as the consideration for such right, franchise, permit, or contract.

#### (e) Notes or drafts maturing less than one year after issuance

Subsection (a) shall not apply to the issue or renewal of, or assumption of liability on, a note or draft maturing not more than one year after the date of such issue, renewal, or assumption of liability, and aggregating (together with all other then outstanding notes and drafts of a maturity of one year or less on which such public utility is primarily or secondarily liable) not more than 5 per centum of the par value of the other securities of the public utility then outstanding. In the case of securities having no par value, the par value for the purpose of this subsection shall be the fair market value as of the date of issue. Within ten days after any such issue, renewal, or assumption of liability, the public utility shall file with the Commission a certificate of notification, in such form as may be prescribed by the Commission, setting forth such matters as the Commission shall by regulation require.

#### (f) Public utility securities regulated by State not affected

The provisions of this section shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission.

#### (g) Guarantee or obligation on part of United States

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

#### (h) Filing duplicate reports with the Securities and Exchange Commission

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the re-

ports, information, and documents required under sections 77g, 78*l*, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, §204, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 850.)

#### Executive Documents

##### Transfer of Functions

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

### § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

#### (a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

#### (b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

#### (c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

#### (d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein pro-

vided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006, Oct. 23, 2018, 132 Stat. 3868.)

**Editorial Notes**

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).
1978—Subsec. (d). Pub. L. 95–617, §207(a), substituted ''sixty'' for ''thirty'' in two places.
Subsec. (f). Pub. L. 95–617, §208, added subsec. (f).

**Statutory Notes and Related Subsidiaries**

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anti-competitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

### § 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

#### (a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

#### (b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

#### (c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric

utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms ''electric utility companies'' and ''registered holding company'' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

### (d) Investigation of costs

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

### (e) Short-term sales

(1) In this subsection:

(A) The term ''short-term sale'' means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term ''applicable Commission rule'' means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

--------
[1] See References in Text note below.

(June 10, 1920, ch. 285, pt. II, §206, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 852; amended Pub. L. 100–473, §2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

### Editorial Notes

#### REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, which was classified generally to chapter 2C (§79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

#### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, §1295(b)(1), substituted ''hearing held'' for ''hearing had'' in first sentence.

Subsec. (b). Pub. L. 109–58, §1295(b)(2), struck out ''the public utility to make'' before ''refunds of any amounts paid'' in seventh sentence.

Pub. L. 109–58, §1285, in second sentence, substituted ''the date of the filing of such complaint nor later than 5 months after the filing of such complaint'' for ''the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period'', in third sentence, substituted ''the date of the publication'' for ''the date 60 days after the publication'' and ''5 months after the publication date'' for ''5 months after the expiration of such 60-day period'', and in fifth sentence, substituted ''If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision'' for ''If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision''.

Subsec. (e). Pub. L. 109–58, §1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, §2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, §2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–473, §4, Oct. 6, 1988, 102 Stat. 2300, provided that: ''The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: *Provided, however*, That such complaints may be withdrawn and refiled without prejudice.''

#### LIMITATION ON AUTHORITY PROVIDED

Pub. L. 100–473, §3, Oct. 6, 1988, 102 Stat. 2300, provided that: ''Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the

costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.].''

STUDY

Pub. L. 100–473, §5, Oct. 6, 1988, 102 Stat. 2301, directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

### § 824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, §207, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

### § 824g. Ascertainment of cost of property and depreciation

#### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

#### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, §208, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

### § 824h. References to State boards by Commission

#### (a) Composition of boards; force and effect of proceedings

The Commission may refer any matter arising in the administration of this subchapter to a board to be composed of a member or members, as determined by the Commission, from the State or each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The board shall be appointed by the Commission from persons nominated by the State commission of each State affected or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

#### (b) Cooperation with State commissions

The Commission may confer with any State commission regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the Commission; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

#### (c) Availability of information and reports to State commissions; Commission experts

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of public utilities. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may upon request from a State make available to such State as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement to the Commission by such State of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 10, 1920, ch. 285, pt. II, §209, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

### § 824i. Interconnection authority

#### (a) Powers of Commission; application by State regulatory authority

(1) Upon application of any electric utility, Federal power marketing agency, geothermal power producer (including a producer which is not an electric utility), qualifying cogenerator, or qualifying small power producer, the Commission may issue an order requiring—

(A) the physical connection of any cogeneration facility, any small power production fa-

ices. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided,* That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further,* That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, §312, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, §1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

### Editorial Notes

#### CODIFICATION

"Sections 1535 and 1536 of title 31" substituted in text for "sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])" on authority of Pub. L. 97–258, §4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

"Director of the Government Publishing Office" substituted for "Public Printer" in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

"Government Publishing Office" substituted for "Government Printing Office" in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such ap-

plication is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States

upon certiorari or certification as provided in section 1254 of title 28.

#### (c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, § 313, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 860; amended June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, § 1284(c), Aug. 8, 2005, 119 Stat. 980.)

#### Editorial Notes

###### CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

###### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, § 16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, § 16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

#### Statutory Notes and Related Subsidiaries

###### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

### § 825m. Enforcement provisions

#### (a) Enjoining and restraining violations

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available

concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

#### (b) Writs of mandamus

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

#### (c) Employment of attorneys

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

#### (d) Prohibitions on violators

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 824u of this title (and related rules and regulations) from—

    (1) acting as an officer or director of an electric utility; or

    (2) engaging in the business of purchasing or selling—

        (A) electric energy; or

        (B) transmission services subject to the jurisdiction of the Commission.

(June 10, 1920, ch. 285, pt. III, § 314, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 861; amended June 25, 1936, ch. 804, 49 Stat. 1921; June 25, 1948, ch. 646, § 32(b), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 109–58, title XII, § 1288, Aug. 8, 2005, 119 Stat. 982.)

#### Editorial Notes

###### CODIFICATION

As originally enacted subsecs. (a) and (b) contained references to the Supreme Court of the District of Columbia. Act June 25, 1936, substituted "the district court of the United States for the District of Columbia" for "the Supreme Court of the District of Columbia", and act June 25, 1948, as amended by act May 24, 1949, substituted "United States District Court for the District of Columbia" for "district court of the United States for the District of Columbia". However, the words "United States District Court for the District of Columbia" have been deleted entirely as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district", and section 88 of Title 28 which states that "the District of Columbia constitutes one judicial district".

###### AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

*Clean Wisconsin Declaration*

## <u>DECLARATION OF RICK COELHO</u>

I, Rick Coelho, do hereby affirm and state:

1.      I am currently a member of Clean Wisconsin. I have been a member of Clean Wisconsin for over a year. I have been involved in and tracking its advocacy since I first became aware of Clean Wisconsin's work in 2012.

2.      I became a member of Clean Wisconsin because I am a strong supporter of its mission to protect Wisconsin's natural heritage, and because I am passionate about its work to center community voices in securing clean air, land, and water for Wisconsinites.

3.      I live in Madison. I am a customer of Madison Gas and Electric Company. I participate in the Shared Solar – Strix community solar program run by MG&E where I pay a nominally higher rate to ensure my electricity is produced at a solar site in Dane County.

4.      My home is roughly 1.25 miles away from Madison Gas & Electric's natural gas fueled Blount Generating Station.

5.      My electric rates have increased steadily since I have lived in Madison. Electric bills have been a source of stress and anxiety for my family during challenging financial times.

6.      I am deeply concerned with electricity rates because of my own family's budget and because of the disproportionate impact high energy bills have

on marginalized citizens all over Wisconsin. I am concerned that without clear rules, increased electricity demand from data centers may further drive up my utility rates.

7.      I work to build support for renewable energy projects in Wisconsin communities and am the Rural Energy Campaign Manager for Clean Wisconsin's Energy Program.

8.      My work involves educating individuals and communities about the economic and environmental benefits of large-scale solar and wind projects sited in communities across rural Wisconsin.

9.      My work involves helping Clean Wisconsin members have a voice in regulatory proceedings where they can support the construction of solar and wind projects and oppose the construction of fossil fuel plants which will increase their energy bills.

10.     I am aware that, per megawatt hour, gas-fired power plants are more expensive to construct and operate than either wind or solar generators and run a much greater risk of becoming stranded assets that will impact rates for decades.

11.     I believe that pollution from Wisconsin's gas-fired power plants impacts the health of myself and my community. I understand that new gas-fired

power plants are being proposed to serve data centers' particular requests for new electricity.

12.     Both as an organizer and a volunteer with several local youth athletic organizations, I regularly talk to individuals who are experiencing health issues because of poor air quality, or who have concerns about their health or the health of their children in the face of air pollution. This has led one organization I am involved with to establish policies regarding AQI. All outdoor games are cancelled when AQI crosses a threshold.

13.     I monitor air quality before engaging in outdoor activity and I have chosen on occasion to refrain from outdoor activities when local air pollution concerns are particularly acute.

14.     I have observed and experienced the effects of climate change in my own life and community, and I am concerned about the contribution of air pollution to these changes. While living in Madison, I have directly experienced flooding on my block and extreme heat impacts due to climate change. As an avid backpacker over the last three decades, I have observed climate-induced changes in wild landscapes across the United States, from the Gila Wilderness in New Mexico being ravaged by routine catastrophic wildfires or the disappearing glaciers of Glacier National Park.

15. I understand that the Federal Energy Regulatory Commission has approved a plan submitted by the Midwest Independent System Operator, known as "ERAS" that is allowing new, mostly gas-fired generators grid access ahead of the standard interconnection process, which is mostly renewable generators.

16. I understand that, in November 2025, Clean Wisconsin and others filed a petition for review of FERC's decision to approve the MISO process.

17. I am also an active volunteer in several youth athletics organizations, including Patriots Youth Hockey Association and Madison Kennedy Little League, where I provide instruction and coaching to youth athletes. I am also a participating member at WORT, a Madison-based community radio station serving south central Wisconsin.

18. I support reversal of FERC's decision for many reasons, but especially because my family, my community, and I would benefit from equitable treatment of renewable resources.

19. I am aware of at least four ERAS gas power plant projects in Wisconsin, both north and south of Madison.

20. I support reversal of FERC's decision because I do not want to be forced to pay for the grid upgrades required to accommodate ERAS power plants.

21. I am particularly concerned with community engagement in and ability to affect whether Wisconsin relies on clean energy or polluting fossil fuels. It is essential that processes have an equitable inclusion of the people who are ultimately affected by energy costs and health impacts. Planning and development of MISO processes should center the voices of those most impacted.

22. I believe that FERC's decision to approve the MISO ERAS process should be reversed as soon as possible because any delay would negatively affect customer costs, air quality and health in my area.

23. It is my understanding that Clean Wisconsin is seeking to join a lawsuit to challenge FERC's approval of the unfair MISO ERAS process. I support Clean Wisconsin joining this lawsuit.

I declare under the penalty of perjury that the foregoing is true to the best of my knowledge, information, and belief.

April 17, 2026

Rick Coelho

*EDP Renewables North America LLC Declaration*

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| Advanced Energy United, | ) | |
| American Clean Power Association, | ) | |
| Clean Grid Alliance, | ) | |
| Solar Industries Association, | ) | |
| | ) | **No. 25-1266** |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| *Respondent.* | ) | |

<u>**DECLARATION OF EDP RENEWABLES NORTH AMERICA LLC
IN SUPPORT OF PETITIONERS' STANDING**</u>

I, David Mindham, hereby declare as follows:

1.  I am over the age of 18.  If called as a witness in this action, I could testify to the facts stated herein.

2.  I am the Sr. Director of Regulatory and Market Affairs for EDP Renewables North America LLC.  I am authorized to make this declaration on behalf of EDP Renewables North America LLC.

3.  EDP Renewables North America LLC is an independent power producer who participates in the generator interconnection process.

4.  As an independent power producer, EDP Renewables North America LLC relies on FERC fulfilling its statutory duty under the Federal Power Act to prevent public utilities from unduly discriminating amongst customers in the provision of transmission service. 16 U.S.C. §§ 824d, 824e.

5. EDP Renewables North America LLC develops and operates projects that are interconnected, or are seeking to interconnect, to the transmission system operated by the Midcontinent Independent System Operator ("MISO"). EDP Renewables North America LLC currently has multiple projects in MISO's standard interconnection queue. As a result, EDP Renewables North America LLC is directly affected by the Orders challenged via this petition. By setting up an expedited queue of projects that is separate from the standard interconnection queue and that will receive special treatment, those Orders ensure that some projects will be treated differently than others.

6. The challenged Orders directly impact EDP Renewables North America LLC and its requests for interconnection. First, ERAS lets a generation project use existing headroom on the transmission system when interconnecting to it, allowing such project to take advantage of existing transmission infrastructure. Because capacity on the transmission system is finite, any excess headroom used by ERAS projects is necessarily unavailable to projects waiting their turns in the standard interconnection queue. That harms projects in the standard interconnection queue, as it increases the likelihood that they will need to pay to upgrade the transmission system, which can cost millions of dollars and significantly delay commercial operations

7. Further, for one of EDP Renewables North America LLC's projects to be chosen for ERAS, it would need to obtain verification from a "Relevant Electric Retail Regulatory Authority" (or "Retail Authority"). Though some projects that are eligible for ERAS are owned by Retail Authorities, EDP Renewables North America LLC is not a "Retail Authority."

-3-

8.  EDP Renewables North America LLC is a member of Petitioners American Clean Power Association, Clean Grid Alliance, and Solar Energy Industries Association.

9.  Petitioners American Clean Power Association, Clean Grid Alliance, and Solar Energy Industries Association can and will adequately represent EDP Renewables North America LLC's interests in this matter without the need for EDP Renewables North America LLC itself to separately participate.

Signed by: *David Mindham* _____

Name: David Mindham

Title: Sr. Director, Regulatory and Market Affairs

Date: 4/16/2026

-4-

## NOTARIAL ACKNOWLEDGEMENT

State of Texas     §

County of Travis §

Before me, Margaret LaMore on this day personally appeared by means of an interactive two-way audio and video communication David Mindham, who has provided satisfactory evidence of identity in accordance with Chapter 406, Texas Government Code to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed. This notarial act was an online notarization. Given under my hand and seal of office this 16th day of April, 2026.

Notary Public: _Margaret LaMore_

SEAL



**Margaret LaMore**

ID NUMBER
12459465-2
COMMISSION EXPIRES
October 12, 2027

Electronically signed and notarized online using the Proof platform.

-4-

ADD-022

*Natural Resources Defense Council Declarations*

ORAL ARGUMENT NOT YET SCHEDULED

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **CLEAN WISCONSIN, ET AL.** | ) | |
| *Petitioners,* | ) | |
| | ) | |
| v. | ) | Case Nos. 25-1264 and |
| | ) | 25-1166 (consolidated) |
| **FEDERAL ENERGY REGULATORY** | ) | |
| **COMMISSION,** | ) | |
| *Respondent.* | ) | |

## DECLARATION OF PATRICIA MARIE GODWIN

I, Patricia Godwin, declare as follows:

1.      I am of legal age and competent to give this declaration, and all matters in this declaration are based on my own personal knowledge unless otherwise specified.

2.      I am a resident of Cedar Falls, Iowa. I have lived in the same mobile park for over 30 years. I hope I do not have find a new place to live, but if I do have to move, I want to stay in Cedar Falls.

3.      I am a member of Natural Resources Defense Council (NRDC). I have been a member of NRDC for about 20 years because I like what it has accomplished to protect air, water, land, and animals, and to fight pollution and

ADD-024

environmental exploitation. A clean environment is important to me on basic principles but also because I suffer from an autoimmune disease which is exacerbated by pollution. For example, although I can buy distilled water and organic food, I cannot buy fresh air. If I cannot breathe, I cannot function so anything that cleans up the environment is good for me and for all of us.

4.      I understand that NRDC has brought a lawsuit challenging the Federal Energy Regulatory Commission's approval of the Midcontinent Independent System Operator's (MISO) expedited resource review process. I understand that my utility, Cedar Falls Utilities (a municipal utility), is a member of MISO. And I understand that the electricity rates I pay are affected by the MISO process that NRDC is challenging.

5.      Each month, I make a single payment to Cedar Falls Utilities for my electricity, gas, and sewer. I am on a budget plan that allows me to pay the same amount each month of the year rather than paying bills that can vary quite a bit depending on the season. This year, my monthly bill is $155 a month. Last year I paid $100 a month.  Many years I have applied for, and usually received, energy assistance from the Low-Income Home Energy Assistance Program (LIHEAP).

6.      Financially, I am considered a person with low income. My income is a combination of Social Security Benefits and Iowa Public Employees' Retirement System (IPERS) benefits.  I work part-time tutoring students at Hawkeye

Community College (HCC), Waterloo, IA where I have been employed for about 22 years. Occasionally, I pet sit, but this is very sporadic and not a predictable source of income.

7.      I do not want my utility bill to go up from rising electricity rates. I have lived from paycheck to paycheck since I became disabled in 1984. Modern medicine has no treatment, much less a cure, for the disease I have. I rely on herbs, vitamins, and supplement to treat my disorder. These cost me an average of $200/month and there is no health insurance reimbursement. I also must live on organic food and distilled water. If electric costs go up, I may have to cut the only treatment that enables me to work and function. I try to live by "Use it up, wear it out, make it do, or do without." However, there comes a point when "doing without" is not possible. Basic needs must be met. I am already cutting costs to the bone and an increase in utility costs might just be the proverbial "straw." Then there are unexpected events that can disrupt a budget.  It is not just the inconvenience of a rise in utility costs, it is the resultant lack of resources if and when other urgent major expenses occur. When the car breaks down and there is no public transport; or the fridge needs to be replaced; or when the rent goes up by 42%, what do I do if electricity is costing me that much more? Last July when our mobile home court was sold without warning my rent did in fact go up 42%.  It is not just the money. It is also the anxiety and stress of living "on the edge" so to

ADD-026

speak.  Problems become bigger if the citizens are elderly and/or disabled because the possibility of finding extra work income is greatly decreased. I am both elderly and disabled. An increase in the cost of electricity would cause me great harm.

8.    I understand that two new generation projects being expedited under this process will be located near me in Iowa – one in Cerro Gordo County and one in Marshall County.  This increases my concerns about how the MISO process will affect my electric bill.

9.    I support NRDC's lawsuit challenging MISO's rule.

I declare under perjury that the foregoing is true and correct. Executed on

April 15   , 2026.

_Patricia M Godwin_

Patricia Marie Godwin

ORAL ARGUMENT NOT YET SCHEDULED

## UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **CLEAN WISCONSIN, ET AL.** | ) | |
| *Petitioners,* | ) | |
| | ) | |
| v. | ) | Case Nos. 25-1264 and |
| | ) | 25-1166 (consolidated) |
| **FEDERAL ENERGY REGULATORY** | ) | |
| **COMMISSION,** | ) | |
| *Respondent.* | ) | |

## DECLARATION OF LORETTA LEMKUIL

I, Loretta Lemkuil, declare as follows:

1.      I am of legal age and competent to give this declaration, and all matters in this declaration are based on my own personal knowledge unless otherwise specified.

2.      I am a resident of Two Rivers, Wisconsin. I will have lived at this address for 10 years on October 31, 2026.

3.      I am a member of Natural Resources Defense Council ("NRDC"), and have been for about 15 years. I support NRDC because there is power in numbers, and I want to stand with others who protect animals.  I, like NRDC, will not stand for injustice, including when certain entities overstep regulatory boundaries in ways that increase electric bills for the public.

4. I understand that NRDC has brought a lawsuit challenging the Federal Energy Regulatory Commission's approval of the Midcontinent Independent System Operator's ("MISO's") expedited resource review process. I understand that my utility, Two Rivers Water and Light, is a member of MISO. And I understand that the electricity rates I pay therefore are affected by the MISO process NRDC is challenging.

5. Each month, I pay Two Rivers Water and Light for my electricity and water service. Wisconsin Public Service provides my gas. All of my utility bills have been increasing while my wages have not. The rise is encroaching on my budget. My electric bill was previously manageable, but it no longer is.

6. I pay my monthly electric bill based on my usage, and I don't feel like I can reduce my usage any further. I work three 12-hour shifts a week in manufacturing, but am also going to school to become a veterinary technician so that I can help animals. I need home internet service so I can attend classes, and I can't do my homework in the dark. The only place I could cut back is on my expenses taking care of my animals, but I don't want them to suffer.

7. I do not want my utility bill to go up from increasing electricity rates. It is already taking up more of my budget and preventing me from saving for future goals.

8.      I understand that two new generation projects being expedited under this process will be located near me in Wisconsin – one in Sheboygan County and one in Kenosha County.  This increases my concerns about how the MISO process will affect my electric bill.

9.      I support NRDC's lawsuit challenging MISO's rule.

I declare under perjury that the foregoing is true and correct. Executed on
April 4th , 2026.

Loretta Lemkuil

*Sierra Club Declarations*

## DECLARATION OF DAVID ROGERS

I, David Rogers, declare as follows:

1.      I am a Deputy Director of the Beyond Coal campaign at Sierra Club, a position that I have held for over two and a half years. I was formerly the Southeast Regional Deputy Director at the Sierra Club, a position that I held for four years.

2.      In my current role, I manage and coordinate Sierra Club's policies and efforts on behalf of its members to advocate for an affordable transition from an electricity system powered by fossil fuels to an electricity system powered by renewable energy resources. The Beyond Coal campaign has a goal of specifically ending harmful coal generation as rapidly as possible, but also focuses on matters relating to interconnecting new, renewable generation, transmission, and electricity affordability in the context of the energy transition. My position requires me to be familiar with Sierra Club's purpose and mission, its activities relating to the electric sector, to proceedings before the Federal Energy Regulatory Commission ("FERC") which impact Sierra Club interests, and to the nature and scope of Sierra Club's membership.

3.      Sierra Club is a non-profit membership organization incorporated under the laws of the State of California, with its principal place of business in Oakland, California. Sierra Club's mission is to explore, enjoy and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

4. I am familiar with the nature and scope of Sierra Club's membership programs, its membership records, and the manner in which information on members can be retrieved. Sierra Club regularly maintains membership records in a database that include the address of each

member. These records are regularly updated to add new members, reflect address changes, and remove the names of persons who are no longer members.

5.      I have examined this database and confirmed that Sierra Club has more than 127,000 dues-paying members that live, use electricity, and pay electric bills in the 15 states within MISO's footprint. This includes a significant number of members that live in MISO and that are likely to experience increased electricity costs as a result of the ERAS program

6.      In my examination of this database I have also confirmed that Belinda Thielen and William Schroeer are current Sierra Club members.

7.      As part of carrying out its mission, for decades the Sierra Club has used the traditional tools of advocacy to push for policies and programs aligned with the organization's vision for the energy future in the United States. Sierra Club has engaged in legislative and administrative advocacy, published technical and policy guidance, and collaborated with public agencies and stakeholders to advocate for robust, reliable, and equitable policies that decarbonize electricity generation while ensuring residential energy rates remain affordable.

8.      Sierra Club strongly supports policies that decrease costs for residential customers because the organization believes that both durable policy and durable coalitions to support the energy transition will require the transition to renewable energy to be affordable for residential ratepayers. Sierra Club also cares about ensuring the energy transition occurs in a way which is equitable and does not harm marginalized communities; low-income households must spend a disproportionate share of their monthly income on electricity bills and so increasing electricity rates could result in an inequitable energy transition. Finally, Sierra Club cares about affordable electricity rates because decarbonizing other sectors of the economy, such as transportation, will require electrifying those sectors of the economy. Sierra Club understands that the price of

electricity impacts the economic incentive for individuals and companies to move from polluting technologies–including internal combustion engine vehicles and gas heating and appliances–to electrified technologies such as electric vehicles and electric home appliances.

9. The Midcontinent Independent System Operator's ("MISO") Expedited Resource Addition Study ("ERAS") program harms Sierra Club's members by increasing transmission costs, which will ultimately be borne by residential ratepayers. Many Sierra Club members who are served by utilities in MISO are frustrated by high electricity bills, and would be harmed if their electricity bills were even higher. Because Sierra Club advocates for decarbonizing transportation as well, many of our members have purchased electric vehicles. High residential electricity prices therefore also increase the cost of transportation for many of our members, causing further harm.

10. Sierra Club also operates multiple offices across the MISO region, each of which uses and pays for electricity in the normal course of business. Sierra Club uses its limited funds to achieve organizational objectives; when more of those funds are required to pay higher electric bills, that reduces the money available to achieve Sierra Club's primary objectives. Thus, Sierra Club as an organization is also directly impacted by higher electricity costs across MISO.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on April 16, 2026.

David Rogers

3

ADD-034

## <u>DECLARATION OF WILLIAM SCHROEER</u>

I, William Schroeer, declare as follows:

My name is William Schroeer. I am over 18 years old. The information in this declaration is based on my personal experience and my review of publicly available information. I have personal knowledge of the following facts, and if called as a witness could testify competently to them. As to those matters which reflect an opinion, they reflect my personal experience, opinion, and judgment on the matter.

1. I live at 206 Winona St, Northfield, MN 55057. I have lived here for the last 12 years.

2. I am the Executive Director of a non-profit organization that advocates for improving public transit and sustainable transportation in and around the east side of the Minneapolis-St. Paul metro region.

3. I first joined the Sierra Club in 1990 and I became a lifetime member in 2023. I joined because Sierra Club shares my values, and I value working with other members of my community to protect the environment and wild places to recreate. I also have participated with my family in outdoor adventure trips which are organized and run by Sierra Club. I actively engage with the Sierra Club North Star chapter to advocate for environmentally conscious transportation and land use policy in the Minneapolis-St. Paul region.

4. My utility provider is Xcel Energy. I currently have rooftop solar on my home, which helps decrease the cost of my electric bill each month. My wife and I both work for non-profit organizations and do not make extravagant salaries. I am concerned that if electricity prices increase, my electric bill will not be as low as it is now and that it will become a larger part of my monthly household budget.

5. My wife and I have an electric vehicle ("EV") and charge it at home. Our residential electric service is critical to our  transportation and our ability to charge and use our EV. Increased electricity prices would therefore also affect our monthly transportation costs.

6. I have also spent significant time, both personally and professionally, advocating for an electric vehicle car share program called "Evie." A substantial portion of the cost of running the Evie car share program is the charging costs for the vehicles. As a result, the price of electricity significantly impacts the costs of running the Evie program. I am concerned that higher electricity costs could increase the costs of the Evie car share and decrease the number of users. I appreciate how the Evie program decreases the total number of cars in my city, and would be harmed if Evie use decreased.

7. I am aware that our utility provider participates as a member of, and receives wholesale services operated by, the Midcontinent Independent System Operator ("MISO"). I am also aware of MISO's Expedited Resource Addition Study ("ERAS") program.

8. I am aware of the Faribault Energy Park near my current residence, and that the gas generator at the Park is set to increase its interconnection service as part of the ERAS program.

9. I am concerned both about increasing electricity costs and about the environment. I am worried that increased electricity costs will add a significant new expense to my monthly budget, and am worried that increased electricity costs will decrease the amount of sustainable transportation options in my city, which I care deeply about.

10. As a ratepayer in Minnesota, I will be harmed if my electricity bills increase as a result of the ERAS fast-track program enabling a cost shift of transmission costs from ERAS projects to ratepayers.

11. I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed on April 10, 2026.

_____

William Schroeer

## DECLARATION OF BELINDA THIELEN

I, Belinda Thielen, declare as follows:

My name is Belinda Thielen. I am over 18 years old. The information in this declaration is based on my personal experience and my review of publicly available information. I have personal knowledge of the following facts, and if called as a witness could testify competently to them. As to those matters which reflect an opinion, they reflect my personal experience, opinion, and judgment on the matter.

1. I live at 1110 Wolff St, Racine, WI 53402 with my husband. We have lived here for the last 34 years.

2. I am a retired factory worker and union representative.

3. I first joined the Sierra Club in 2003 and became a Lifetime Member in 2005. I joined because of my concern for the environment. I care about the world and believe that affordable renewable energy is better for the environment, and for my community. I also have a master's degree in environmental and health sciences, and learned about the negative impacts of particulate matter on people's health from fossil fuel generation.

4. Our utility provider is We Energies. In recent years, our electricity rates have increased significantly. We just had a rate increase in our electricity fairly recently. Our electricity bill is a huge part of our monthly expenses. We are retired and live on fixed incomes, so are concerned about increasing electric utility bills.

5. We have an electric vehicle ("EV") and charge it at home. Our residential electric service is critical to our  transportation and our ability to charge and use our EV. Electric service

ADD-038

is also important to us so we can use our washer and dryer, lights, electric stove, and computers. In short, electricity is critical to my life and my husband's life.

6. Increasing electric bills would increase the cost of using all of these important devices and appliances, and so would pose a significant harm to us.

7. I am aware that our utility provider participates as a member of, and receives wholesale services operated by, the Midcontinent Independent System Operator ("MISO"). I am also aware of MISO's Expedited Resource Addition Study ("ERAS") program.

8. I am aware of the Red Oak Ridge Energy Center proposed near our current residence, and that this facility is set to connect to the power grid via the ERAS program.

9. As a person who has worked with regulatory agencies, I know how important regulations are, especially related to the electric grid. But I personally know that corporations will take whatever shortcuts they can without respect to peoples' wellbeing. I think the ERAS program may be designed to create shortcuts for the utility industry to make quick profits without any concern for consequences. I think the ERAS program, in how I understand it to function, creates plausible deniability for utility providers when there are consequences, like increased electricity bills for ratepayers like myself.

10. I am concerned both about increasing electricity costs and about the environment. Gas-burning facilities pollute the environment and health of people, such as by emitting particulate matter.

11. As a ratepayer in Wisconsin, I will be harmed if our electricity bills increase as a result of the ERAS fast-track program enabling a cost shift of transmission costs from ERAS projects to ratepayers.

12. I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed on April 10, 2026.

Belinda Thielen